UNITED STATES of America, Plaintiff,

v.

HOUSING AUTHORITY OF the CITY OF CHICKASAW, Alabama, Defendant.

Civ. A. No. 79–0099–H.

United States District Court, S. D. Alabama, S. D.

March 7, 1980.

Frank E. Schwelb, Joel L. Selig, and Denise Z. Field, Civil Rights Division, Dept. of Justice, Washington, D. C., for plaintiff.

Mitchell G. Lattof, and J. Cecil Gardner, Mobile, Ala., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HAND, District Judge.

### I. FINDINGS OF FACT

1. The defendant is a public housing authority, regulated and subsidized by the United States Department of Housing and Urban Development (hereinafter HUD).

2. The defendant operates 309 units of public housing in the City of Chickasaw, Alabama.

3. The defendant has never housed a Negro tenant.

4. From December 11, 1962 until the present, the defendant has enforced a "citizenship requirement" providing that only "citizens" of Chickasaw, Alabama are eligible for housing in the defendant housing authority's units.

5. The City of Chickasaw was incorporated as a City in 1946 under Alabama law.

6. The City of Chickasaw is located in Mobile County, approximately five miles from downtown Mobile, and it borders the City of Prichard.

7. The population of the City of Chickasaw is about 8,000; the population of the City of Prichard is about 40,000; the population of the City of Mobile is 205,000.

8. No Negroes currently live in the City of Chickasaw. With the exception of one family who lived in Chickasaw for two weeks, see *infra* 103–121, no Negroes have resided in the City of Chickasaw since World War II.

9. According to the 1970 census, .3% of the population of Chickasaw is Negro.

10. According to the 1960 census, .03% of the population of Chickasaw was Negro.

11. According to the 1950 census, .04% of the population of Chickasaw was Negro.

12. According to the 1970 census, 50.5% of the population of Prichard is Negro.

13. According to the 1960 census, 47.1% of the population of Prichard was Negro.

14. According to the 1970 census, 32.3% of the population of Mobile County is Negro.

15. According to the 1960 census, 32.1% of the population of Mobile County was Negro.

16. The Commissioners of the Chickasaw Housing Authority are aware of the approximate racial composition of the cities of Mobile and Prichard and of Mobile County. They are also aware that the Prichard Housing Authority houses primarily Negro persons.

17. Like other public housing authorities, the defendant provides housing for low income individuals and families and enforces a maximum limit on the income an applicant or family unit can earn and still be eligible for housing.

18. According to the 1970 census, 59.4% of the population of Mobile County who receive less than 125% of poverty-level income are Negro.

19. According to the 1970 census, 72.0% of the population of Prichard who receive less than 125% of poverty-level income are Negro.

20. When adopted initially, the citizenship requirement excluded all qualified Negro applicants residing in Mobile County from living in the defendant Housing Authority's units.

21. At all times since its adoption in 1962, the citizenship requirement has excluded all otherwise qualified Negroes from living in the defendant's housing authority.

22. In August 1961, Mayor J. C. Davis selected the five original members of defendant's Board of Commissioners: C. E. Burrell, Aldon L. Smith, James Q. Yance, Jesse T. Miller and Julian H. Livings, who was the first chairman of the defendant Housing Authority.

The Minutes of the Chickasaw Housing Authority meeting of August 10, 1961 (Pl. Ex. # 2) shows that in forming a public housing authority under Alabama law, Mayor Davis and the City Council of the City of Chickasaw had to and did determine that a need for public housing existed within ten square miles of the City of Chickasaw.

23. The Mayor formed the Housing Authority for the purpose of acquiring control over Gulf Homes, a development of about 600 units of public housing located in the City of Chickasaw, from the Mobile Housing Board.

24. At the time the defendant took over Gulf Homes in January, 1963, none of the tenants were Negro.

25. The federal government built Gulf Homes under the Lanham Act during World War II. After the war, this housing was turned over for management to the Mobile Housing Board, then the only public housing authority in Mobile County.

26. The Mayor and the Board of Commissioners of the defendant Authority have stated the following reasons for acquiring Gulf Homes:

(a) They wanted to stop the Mobile Housing Board from "dumping social undesirables" in Gulf Homes;

(b) The tenants of Gulf Homes were causing many altercations which burdened the local police force;

(c) Gulf Homes had become an eyesore badly in need of repair;

(d) The project would better serve the residents of Chickasaw and would be run more efficiently if managed locally;

(e) The City of Chickasaw should control whatever public housing existed within its boundaries.

27. According to the trial testimony of James A. Alexander, Executive Director of the Mobile Housing Board, the Mobile Housing Board did not "dump social undesirables" in Gulf Homes. In fact, the Mobile Housing Board did not assign persons to Gulf Homes; instead, prospective tenants applied directly at Gulf Homes for housing.

28. As operated by the Mobile Housing Board, Gulf Homes was open to citizens of Chickasaw who desired housing therein.

29. When it took over the operation of Gulf Homes in January, 1963, the Board of Commissioners of the Chickasaw Housing Authority was aware of rules promulgated by the Public Housing Administration which allowed it to evict tenants who threatened the welfare of other residents. Mr. Burke E. Langham, the Authority's Executive Director, used this authority to evict such tenants beginning in January 1963. The Housing Authority also had the authority to screen tenants to insure that it did not house persons who had a history of causing disturbances or problems for others.

30. In January, 1962, the Mobile Housing Board, through James Alexander, its Executive Director, requested assurance from the Chickasaw Housing Authority that the City of Chickasaw was prepared to subsidize the operations of the Chickasaw Housing Authority. In the spring of 1962, the Public Housing Administration requested similar assurances. In June and July, 1962, Chickasaw City Attorney William McDermott provided two legal opinions in which he stated that the City of Chickasaw did have the legal authority to subsidize and support the Chickasaw Housing Authority. Mr. McDermott did not mention in either opinion that such financial support from the City of Chickasaw could be provided only if the Housing Authority served only residents of the City of Chickasaw. At the time these two opinions were offered, the Chickasaw Housing Authority had not adopted or discussed the citizenship requirement.

31. According to the minutes of the Board of Commissioners meeting of November 8, 1962, Mayor Davis appeared before the Commissioners of the Chickasaw Housing Authority and stated that the City was prepared to give the Housing Authority $61,398.00 as an "outright gift". The Housing Authority had asked for this money so it could pay off an administrative loan owed by the Mobile Housing Board to the Public Housing Administration. The Chickasaw Housing Authority had not adopted the citizenship requirement as of November 8, 1962.

32. Mayor Davis did not condition the city's financial support of the Housing Authority in any way on the Housing Authority's adoption of a "citizenship requirement". Indeed, the Commissioners of the Housing Authority adopted the citizenship requirement after receiving the sum of $61,398.00 from the city.

33. The Public Housing Administration, the predecessor of HUD, supervised and approved the transfer of the management of Gulf Homes from the Mobile Housing Board to the defendant.

34. When the defendant undertook management of Gulf Homes in January, 1963, its Commissioners understood that the Public Housing Administration would finance the demolition of Gulf Homes and the construction of new public housing units on the same site. During the next several years, starting in 1965, the defendant authority replaced the more than 600 units of Gulf Homes with the current 309 units of public housing using funds provided by the Public Housing Administration.

35. In renovating Gulf Homes, the Chickasaw Housing Authority did not build the total number of units which the Public Housing Administration concluded should be constructed in light of prevailing need.

36. Like other public housing authorities, the defendant has operated with monies it receives as rents from its tenants and with annual subsidies from the Department of Housing and Urban Development.

37. In mid-December, 1962, the Mayor and Mr. Livings signed a cooperation agreement, sent by the Public Housing Administration, which outlined the city's responsibilities to the Housing Authority. The mayor of the city and the chairman of the Housing Authority both knew that the document had to be signed as a condition of federal financial assistance. Among its responsibilities, the city promised to provide all services to the Housing Authority which it provided to other persons and institutions within the city limits. It also promised to deed and vacate all streets and other territory within the limits of the Housing Authority and fulfill its obligations to the tenants of the Housing Authority regardless of whether the Chickasaw Housing Authority or some other governmental institution operated the housing.

38. The vast majority of the measures taken by the city in support of the Chickasaw Housing Authority and referred to at the trial of this matter by Mayor Davis and the Commissioners of the Housing Authority are required by the terms of the cooperation agreement. Most of the present and past Commissioners of the Housing Authority who testified at trial had no knowledge of this written cooperation agreement; nor did they know of the terms of the agreement or whether the "services" which the city has provided are required by the agreement.

39. The city has given the defendant no direct or indirect financial support or assistance in raising or borrowing money, aside from the $61,398.00 it provided initially.

40. Since 1962, the defendant has inquired about the possibility of such financial assistance only once, when in 1962 it approached the Chickasaw City Council about endorsing a promissory note for $15,-000 to be made by the defendant to raise operating capital. Eventually, the defendant decided not to borrow any capital and, therefore, did not request the city's assistance.

41. Since it acquired Gulf Homes in 1962, the defendant Authority has never operated at a loss.

42. The commissioners · anticipate no need to seek financial assistance from the city.

43. On December 1, 1962, the defendant hired Mr. Burke E. Langham, a retired Army officer, as Executive Director. Mr. Langham was Executive Director until his resignation, effective June 30, 1979. Ms. Audrey Franklin, an employee of the defendant since 1968, succeeded Mr. Langham as Executive Director, effective July 1, 1979.

44. On December 11, 1962, three weeks before assuming control of Gulf Homes, the defendant's Board unanimously adopted guidelines governing admission and continued occupancy in its units. These guidelines duplicated those used by the Mobile Housing Board with one addition. As a requirement for housing, the defendant's Board added that an applicant must be a "citizen of Chickasaw, Alabama." Executive Director Langham drafted the citizenship requirement at the direction of Mr. Livings, then chairman of the Housing Authority.

45. The minutes of the meeting of the Board of Commissioners of the defendant Authority show no discussion as to the purpose of the citizenship requirement or how it would be enforced.

46. Members of the Board and Mr. Langham recall adopting the requirement to prevent the use of Gulf Homes as a "dumping ground for social undesirables" and to ensure that the citizens of the City of Chickasaw were provided housing. See note 2 infra.

47. When it adopted the citizenship requirement, the Board of Commissioners was aware of the fact that no Negroes lived within the City of Chickasaw and that a significant number of Negroes lived in Prichard and Mobile.

48. When it adopted the citizenship requirement, the Board of Commissioners was aware that the City of Chickasaw had a reputation as a Caucasian town and that no Negroes had lived in Chickasaw since World War II.

49. In assuming control over Gulf Homes, the defendant adopted rules and regulations which allowed for the eviction of tenants for good cause.

50. On August 22, 1978, the Commissioners of the Chickasaw Housing Authority amended the Admission and Continued Occupancy Policies and Procedures adopted on June 29, 1965. Section II of the *Conditions Governing Eligibility and Admission and Continued Occupancy* now includes, *inter alia*, the following:

Admission Selection Criteria: This authority will admit eligible applicants to occupy units in the low-rent housing program operated by this Authority who, at the time of admission, meet all of the following criteria . . .

7. Whose past performance in meeting financial obligations, especially rent, is satisfactory.

8. Whose family has no history of disturbance of neighbors, destruction of property, poor living and housekeeping habits at prior residence, which would adversely affect the health, safety and welfare of other tenants . . .

10. Whose family will not be a detriment to the health, safety or morals of the neighborhood or the community; would have no adverse influence on the sound family and community life; and would not be a source of danger or disturbance to the peaceful occupancy or other tenants.

51. The Executive Director of the Housing Authority is now and has always been responsible for enforcing the citizenship requirement.

52. Each applicant for public housing in Chickasaw is told of the citizenship requirement when he inquires about housing at the Housing Authority.

53. All applicants must provide their current address on the application.

54. If an applicant provides an address which is not within the City of Chickasaw, he is rejected for that reason.

55. If an applicant provides an address within the City of Chickasaw, under Resolution 143, adopted by the Board of Commissioners in 1965, the Executive Director must conduct a "physical check" to determine if the applicant actually resides at the address provided. To conduct this check, the Executive Director visits the address given, often at odd hours such as 6:00 a.m. If found at that address, the applicant is deemed to qualify as a citizen of Chickasaw.

56. The process of verifying an applicant's current address usually is concluded if the Executive Director finds the person at the address provided. Neither Mr. Langham, when he was Executive Director, nor Ms. Franklin, the current Executive Director, asks applicants whether they intend to stay in the City of Chickasaw if they fail to obtain public housing or whether they have moved to Chickasaw for the sole purpose of becoming eligible for public housing.

57. The application requests information about the applicant's need for housing. Over 50% of the current tenants of defendant indicated on their applications that they needed housing because they were living with relatives in Chickasaw. Many of those who indicated that they were living with relatives were either senior citizens, living with a married son or daughter, or young couples, living with the parents of the husband or wife.

58. The Board of Commissioners is aware that, outside of its public housing units, there is a shortage of housing in Chickasaw that low-income families could afford. On June 4, 1974, the Board adopted a policy preventing the eviction of overin-

come tenants because such tenants had repeatedly demonstrated to the Board their inability to locate affordable housing in the private market within the City of Chickasaw.

59. Each applicant is asked on the application how long he has lived in the "locality". Approximately 30% of the current tenants indicated residency of one month or less. Of these, more than half also indicated that they needed housing because they were living with relatives in Chickasaw.

60. It is substantially more difficult for Negroes than Caucasians to meet the citizenship requirement in the City of Chickasaw because Negroes do not have relatives in the city and, therefore, cannot move in on a temporary or permanent basis with relatives living in Chickasaw.

61. An applicant need not own or rent his own residence in Chickasaw to qualify as a "citizen".

62. An applicant need not reside in Chickasaw for any specified length of time before he can qualify as a citizen.

63. There are no motels or hotels within the City of Chickasaw.

64. There are two apartment complexes and three rooming houses in Chickasaw. The Garden Lane Apartments, located in Chickasaw has 96 units with rents from $135 per month for an unfurnished one-bedroom apartment to $166 per month for a two-bedroom furnished apartment. Beth Court Apartments, located in Chickasaw, has rents ranging from $110 per month for one-bedroom apartments to $150 per month for two-bedroom apartments. Bodden Court, located in Chickasaw, has 22 rooms for rent at $25 per week and has 12 one- and two-bedroom apartments with rents ranging from $45 to $50 per week. The Palmer House, located in Chickasaw, has 8 apartments which rent for $40 per week. The manager of Bodden Court also manages another building in Chickasaw with 10 one- and two-bedroom apartments which rent for $40 per week.

65. According to the Development Plan, City of Chickasaw, prepared in June 1972 by the South Alabama Regional Planning Commission, "vacant, adequate housing available for rent or purchase, remains virtually non-existent [in Chickasaw]." (p. 99).

66. An applicant for public housing who works in Chickasaw but lives outside the city does not qualify as a "citizen" for the purposes of the citizenship requirement.

67. Some Negroes are currently employed within Chickasaw.

68. An applicant who has looked for housing in Chickasaw without success does not qualify as a "citizen" for the purposes of the citizenship requirement.

69. As a public housing authority supported in part by federal funds, the defendant has pledged to follow all the rules, regulations and guidelines promulgated by HUD.

70. After an on-site review conducted in 1975, HUD asked the defendant to re-evaluate its citizenship requirement in light of HUD's finding that it excluded otherwise qualified Negro applicants from public housing in Chickasaw.

71. Writing on behalf of the Board of Commissioners, in February 1976, Mr. Langham responded that HUD's recommendation concerning the citizenship requirement was "unacceptable since it is not considered to be in our best interest."

72. After a follow-up, on-site review conducted in 1976, HUD notified the defendant that it was operating in non-compliance with Title VI of the Civil Rights Act of 1964 because of its citizenship requirement, and instructed the defendant to formulate a plan to remedy this violation or face a possible loss of HUD funding.

73. At no time since HUD communicated its finding to the defendant in 1976 has the Housing Authority submitted any plan to remedy the segregative effect found by HUD. Instead, agents of the defendant have informed HUD that defendant would continue to apply its existing admissions policies, including the citizenship requirement.

74. When in November 1976, HUD notified the defendant that the Authority's compliance file was being forwarded to HUD's central office in Washington, D. C. for possible enforcement, the Commissioners authorized Executive Director Langham and Chairman Burrell to defend the citizenship requirement before HUD officials in Atlanta, Georgia.

75. In January 1977, at a meeting with HUD officials in Atlanta, Mr. Burrell explained that the citizenship requirement was adopted to prevent the use of defendant's units as a "dumping ground for social undesirables" and to place the defendant in a better position to provide for the needs of the low-income families of the City of Chickasaw.

76. HUD officials did not change their position with respect to the "citizenship requirement" either at or after the meeting with defendant's agents in January 1977.

77. HUD has never revoked or modified its 1976 determination that the citizenship requirement violates Title VI of the Civil Rights Act of 1964.

78. The defendant has refused to drop the citizenship requirement because it desired to promote the interests of the residents of Chickasaw and to stem the flow of undesirables who might try to move into the small community.

79. In 1978, the Board of Commissioners of the defendant re-enacted its regulations governing admission to the defendant's units and maintained the citizenship requirement with full knowledge that its operation excluded Negroes from its units of housing.

80. The Prichard Housing Authority has a waiting list of approximately 1,000 Negro persons for conventional public housing and of more than 1,800 Negro persons for Section 8 certificates.

81. Many applicants for housing at the Prichard Housing Authority have waited more than two years to be placed in public housing.

82. Some of the applicants on the waiting list for housing at the Prichard Housing Authority would apply for housing at the defendant Housing Authority if the citizenship requirement were eliminated.

83. The Mobile Housing Board has a waiting list of approximately 1,000 persons for conventional public housing and of more than 900 persons for Section 8 certificates. The large majority of applicants on these waiting lists are Negro.

84. Some applicants for housing at the Mobile Housing Board have waited for over three years for public housing to become available.

85. The defendant has a waiting list of approximately 25 persons for conventional low income housing.

86. In Chickasaw, the average length of time current tenants wait for housing to become available is less than one month. Many tenants are housed within a week of the date on their applications.

87. The Prichard Housing Authority has advertised the availability of subsidized public housing on Mobile radio and television stations and in the Mobile newspapers at the commencement of operations and again when it began participation in the Section 8 rent subsidy program.

88. The Mobile Housing Board sponsored similar advertisements in the Mobile media and has a slide show concerning the availability of public housing which it circulates to interested community organizations.

89. The Chickasaw Housing Authority has never advertised the availability of public housing.

90. In November 1978, Ms. Ardia Mitchell sought low-income housing in the Mobile County area. At the time, she lived with her parents and other relations in very crowded conditions in Creola, Alabama. Ms. Mitchell had a limited income and five children and was unemployed.

91. In November 1978, Ms. Mitchell, a Negro woman, contacted the Mobile Housing Board by telephone. An unidentified female advised her to contact the defendant, the public housing authority nearest to her residence in Creola.

92. Before this conversation, Ms. Mitchell did not know that public housing was available in Chickasaw.

93. When Ms. Mitchell called the defendant, an unidentified female answered. She asked neither Ms. Mitchell's race nor her current address. She scheduled Ms. Mitchell for an appointment at 2:00 p. m. on an afternoon the following week.

94. The following week, Mr. George Walker, a friend and neighbor of Ms. Mitchell's, drove her to the defendant's administrative office in Chickasaw.

95. Two unidentified females were in the defendant's office as Ms. Mitchell entered.

96. Ms. Mitchell gave one employee her name and explained that she had an appointment concerning possible housing.

97. Without comment or question, that employee stated that only Chickasaw residents were eligible for housing in the units operated by defendant and that, since Ms. Mitchell was not a resident of Chickasaw, she could not apply for housing.

98. Before making this statement, the employee did not ask Ms. Mitchell where she lived and Ms. Mitchell had not provided this information.

99. The other employee expressed her regret to Ms. Mitchell who left immediately and without further discussion.

100. Ms. Mitchell has had no contact with the defendant since this incident.

101. In September 1978, Mr. and Mrs. Roosevelt Zeine and their three children moved to 409 9th Street, Chickasaw.

102. According to Mayor Davis, the Zeines were the first and only Negro family to move into and reside within the City of Chickasaw since World War II.

103. Several members of defendant's Board of Commissioners were aware that a Negro family had moved into Chickasaw and of the circumstances of its departure.

104. The Zeines rented their house from Mr. Harris Friedlander, a real estate agent with offices in Mobile.

105. Both the Zeines and Mr. Friedlander experienced harassment shortly after the family moved into Chickasaw.

106. Shortly after the Zeines moved in, Mr. Friedlander began receiving phone calls from persons who identified themselves only as residents of Chickasaw. The callers threatened Mr. Friedlander with bodily harm because he had rented a house in Chickasaw to a Negro family.

107. After learning of the presence of a Negro family in the City of Chickasaw from his Chief of Police, Mr. Jackson, Mayor J. C. Davis called Mr. Friedlander. The Mayor testified that he called Mr. Friedlander because he was concerned with the welfare and safety of the Zeine family. The Mayor did not contact the Zeines to inform them that he feared for their safety.

108. In his conversation with Mr. Friedlander, the Mayor testified that he voiced his concern that the realtor had placed the Zeines in an unsafe area of Chickasaw. The Mayor testified that a four square block area, including the street on which the Zeines lived, is unsafe for any Negro family due to proximity of Ku Klux Klan members.

109. After learning of the presence of the Zeines in Chickasaw, Mayor Davis ordered Police Chief Jackson to patrol the vicinity of their home twenty-four hours each day.

110. On orders from the Mayor the police visited the Zeines on several evenings during their first week in the city.

111. During one such visit, the police officers told the Zeines that a firebomb had been thrown into their backyard.

112. While the Zeines lived in Chickasaw, they observed people driving back and forth along their street, staring at their house. On the other hand, despite this curious behavior, some children who lived in the neighborhood stopped by to play with the Zeines children.

113. In view of the firebomb incident, the repeated visits by the police and constant scrutiny by the public, the Zeines decided that it was unsafe for Mrs. Zeine and

the children to remain in their residence after Mr. Zeine departed for work at 5:00 a. m. each morning. Therefore, Mrs. Zeine did not stay at home during the day.

114. At about this time, wishing to avoid further harassment, Mr. Friedlander decided to turn the house which was being rented by the Zeines over to another real estate agent for sale. Accordingly, he gave the Zeines thirty (30) days notice to vacate the premises.

115. The Zeines decided to leave Chickasaw because of a second incident of harassment, not because of the notice. They moved before the thirty days had run and before they had found another residence.

116. As the Zeines were driving, within two blocks of their home in Chickasaw, returning from Mobile, a rock shattered their car windshield, scattering glass on the family. This incident occurred in the early evening about two weeks after their arrival in Chickasaw. Cross examination established that the street on which the incident occurred was poorly lit, so poorly lit that whoever threw the rock may have been unable to see who occupied the car. The testimony was equivocal as to whether this unfortunate incident was racially motivated or an act of simple, albeit regretable, vandalism.

117. The day after the rock was thrown through their car, the Zeines moved their belongings from Chickasaw to the home of Mrs. Zeine's parents in Mobile, until they could locate another house.

118. After moving to Chickasaw, Mrs. Zeine learned that it has a reputation for Ku Klux Klan activity. She testified that, nonetheless, her family would return to Chickasaw if the town were safe for them.

119. Mayor A. J. Cooper has been Mayor of Prichard for more than seven years. During this period, he has had numerous conversations concerning Chickasaw with his constituents. Additionally, he has had many experiences of his own in Chickasaw and with City of Chickasaw officials. The Mayor testified substantially as follows:

(a) Persons currently on the waiting list for public housing in Prichard, many of whom have waited for more than one year for habitable public housing, would move anywhere, including to Chickasaw, for such housing.

(b) These individuals would move to Chickasaw despite the common reputation of that City as anti-Negro, because they desperately need public housing and cannot find it in Prichard.

(c) Chickasaw is commonly regarded as an all-Caucasian community desirous of maintaining itself as all-Caucasian, exclusive of Negro persons, and has pursued a policy of excluding Negroes from employment and housing in Chickasaw.

120. Mr. Grady Lloyd, a local pollster, testified for defendants and stated that he conducted a survey of the applicants on the waiting list for conventional public housing at the Prichard Housing Authority and Mobile Housing Board to determine their housing preferences. His report indicates that only two of the applicants surveyed indicated that they would prefer to live in Chickasaw in response to a question: "Is there any other area in or around Mobile where you would rather live if the same type housing were available?" According to Mr. Lloyd's testimony at trial, it is impossible to determine from his survey whether the applicants would consider living in Chickasaw if they were informed that public housing was available.

121. The results of Mr. Lloyd's survey indicate that 42.9% of the applicants on the waiting list for the Prichard Housing Authority currently live outside of Prichard. Only a slight majority of those applicants, 55.4%, indicated a preference to remain in Prichard. Approximately, fifty respondents indicated that they would consider moving anywhere housing was available. Little weight is to be given Mr. Lloyd's survey because the survey design contained a fatal defect: pollsters never directly asked callers to identify their race. Instead, the race of the callers was determined through voice identification by the pollsters. That method has a common-sense

appeal, but it lacks the reliability needed to make the results of the survey credible. In addition to this inherent design defect, there was no evidence which established the qualifications of the pollsters to identify the race of a person on the basis of the person's voice.

## II. CONCLUSIONS OF LAW

### A. Jurisdiction

■ 1. This suit was brought by the Attorney General pursuant to the Fair Housing Act, Title VIII of the Civil Rights Act of 1968. 42 U.S.C. §§ 3601–3619, 3631. Section 813 of that Act, 42 U.S.C. § 3613, authorizes the Attorney General to bring a civil action in the appropriate district court when he has reasonable cause to believe "that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights granted by this title, or that any group of persons has been denied any of the rights granted by this title and such denial raises an issue of general public importance .... " The Attorney General's determinations of reasonable cause and general public importance are not reviewable. *United States v. Northside Realty Associates*, 474 F.2d 1164, 1168 (5th Cir. 1973), *after remand*, 501 F.2d 181 (5th Cir. 1974), *rehearing denied*, 518 F.2d 884 (5th Cir. 1975), *cert. denied*, 424 U.S. 977, 96 S.Ct. 1483, 47 L.Ed.2d 747 (1976); *see United States v. Bob Lawrence Realty Co.*, 474 F.2d 115, 125 (5th Cir. 1973), *cert. denied*, 414 U.S. 826, 94 S.Ct. 131, 38 L.Ed.2d 59 (1973) (construction of § 3613).

2. Defendant Housing Authority of the City of Chickasaw, Alabama is a "person" within the meaning of Section 802(d) of the Act. 42 U.S.C. § 3602(d). *United States v. City of Parma*, 1 EOHC ¶ 13,616 (N.D.Ohio 1973). *Accord, United States v. City of Black Jack*, 508 F.2d 1179 (8th Cir. 1974), *cert. denied*, 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975), *after remand*, 605 F.2d 1033 (8th Cir. 1979), *cert. denied*, 445 U.S. 905, 100 S.Ct. 1081, 63 L.Ed.2d 321 (1980). It is engaged in the rental of housing units or dwellings within the meaning of Section 802(b). 42 U.S.C. § 3602(b).

3. In this suit, the United States challenges defendant's use of a "citizenship requirement", contending that its use makes housing unavailable to blacks in violation of Section 804(a) of the Fair Housing Act. 42 U.S.C. § 3604(a). Under the citizenship requirement, defendant limits prospective tenants to those who are already residents of the City of Chickasaw. The United States contends that the enforcement of this requirement in a city that, since its incorporation, has had virtually no Negro residents has resulted in a public housing facility that has never had a Negro tenant despite being located in an area of Mobile County with a substantial Negro population, a large proportion of which is in serious need of low-income housing.

4. This Court has jurisdiction over this action pursuant to 42 U.S.C. § 3613 and 28 U.S.C. § 1345.

### B. Scope of the Fair Housing Act

■ 5. The purpose of the Fair Housing Act is to provide, within constitutional limitations, for fair housing throughout the United States. 42 U.S.C. § 3601. The Act implements the Congressional policy favoring the achievement of integrated living patterns. *Trafficante v. Metropolitan Life Insurance Co.*, 409 U.S. 205, 211, 93 S.Ct. 364, 367, 34 L.Ed.2d 415 (1972). The Act is to be construed generously to ensure the prompt and effective elimination of all traces of racial discrimination in the housing field. *Id.* at 211–212, 93 S.Ct. at 367–368. *See also, e. g. Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979).

■ 6. Section 804(a) forbids not only the refusal to sell or rent a dwelling, but also prohibits all practices that "*otherwise make unavailable or deny*" housing to any person because of race, color, religion, sex or national origin. 42 U.S.C. § 3604(a) (emphasis added). This provision is as broad as Congress could have made it and it reaches every private and public practice that makes housing more difficult to obtain on prohibited grounds. *United States v. City*

*of Parma*, 1 EOHC ¶ 13,616 (N.D.Ohio 1973); *United States v. Youritan Construction Corp.*, 370 F.Supp. 643 (N.D.Cal.1973), *aff'd in relevant part*, 509 F.2d 623 (9th Cir. 1975); *Zuch v. Hussey*, 394 F.Supp. 1028 (E.D.Mich.1975), *aff'd in relevant part*, 547 F.2d 1168 (6th Cir. 1977) (*per curiam* ).

## C.  Pattern or Practice of Discrimination

■ 7.  To satisfy the pattern or practice provision of Section 813, 42 U.S.C. § 3613, the Government must prove more than an isolated, accidental or peculiar departure from a non-discriminatory norm. *United States v. Pelzer Realty*, 484 F.2d 438, 445 (5th Cir. 1973), *cert. denied*, 416 U.S. 936, 94 S.Ct. 1935, 40 L.Ed.2d 286 (1974); *United States v. Reddoch*, 1 EOHC ¶ 13,569 (S.D.Ala.1972), *aff'd*, 467 F.2d 897 (5th Cir. 1972).  When, as here, a policy of regular application is itself alleged to be discriminatory, the pattern or practice requirement is satisfied.  *United States v. Hughes Memorial Home*, 396 F.Supp. 544, 551 (W.D.Va.1975); *see also* 106 Cong.Rec. 7223 (Senator Keating).

## D.  Standards for Proving Fair Housing Act Violations

■ 8.  There are two ways of proving that rights secured by the Fair Housing Act have been violated.  One is to show that the actions complained of were discriminatorily motivated.  *See, e. g., United States v. West Peachtree Tenth Corp.*, 437 F.2d 221 (5th Cir. 1971).  In the absence of proof of racially discriminatory intent, the other way to establish a violation of the Act is to show that certain conduct has a segregative effect and that the conduct lacks an adequate, countervailing, legitimate justification.  *Metropolitan Housing Development Corporation v. Village of Arlington Heights* (hereinafter *Arlington Heights II* ) 558 F.2d 1283 (7th Cir. 1977), *cert. denied*, 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978); *Resident Advisory Board v. Rizzo*, 564 F.2d 126 (3rd Cir. 1977); *United States v. City of Black Jack*, 508 F.2d 1179 (8th Cir. 1974), *cert. denied*, 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975), *after remand*, 605 F.2d 1033 (8th Cir. 1979), *cert. denied*, 445 U.S. 905, 100 S.Ct. 1081, 63 L.Ed.2d 321 (1980); *cf. Robinson v. 12 Lofts Realty*, 610 F.2d 1032 (2d Cir. 1979) (discrimination against individuals and *not* large groups).  The Government asserts that defendant Housing Authority is liable under both theories.  After assessing all of the evidence presented and setting forth detailed findings of fact, this Court is unable to agree with the Government's contentions.

## 1.  Segregative Intent

■ 9.  Standards for determining racially discriminatory intent have evolved not only in Fair Housing litigation but also in cases involving alleged violations of the equal protection clause, where proof of intent is required.  *See Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *see e. g., Columbus Board of Education v. Penick*, 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979); *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (hereinafter *Arlington Heights I* ).  Because explicit statements of racially discriminatory motivation are decreasing, circumstantial evidence must often be used to establish the requisite intent.  Among the factors that are instructive in determining whether racially discriminatory intent is present are:  discriminatory or segregative effect, historical background, the sequence of events leading up to the challenged actions, and whether there were any departures from normal or substantive criteria.  *Arlington Heights I*, 429 U.S. at 266–267, 97 S.Ct. at 563–565.  Another highly relevant *factor* is whether the defendant adhered to a policy with full knowledge of its segregative effects.  *Columbus Board of Education v. Penick*, 443 U.S. at 465, 99 S.Ct. at 2950, 61 L.Ed.2d at 681; *United States v. Texas Education Agency* (Austin I.S.D.) 579 F.2d 910, 913 (5th Cir. 1978); *see also Dayton Board of Education v. Brinkman*, 443 U.S. 526, 536 n. 9, 99 S.Ct. 2971, 2978 n. 9, 61 L.Ed.2d 720, 732–733, n. 9 (1979); *Personnel Administration of Massachusetts v. Feeney*, 442 U.S. 256, 279 n. 25, 99 S.Ct. 2282, 2296 n. 25, 60 L.Ed.2d 870, 888, n. 25 (1979).

10. As for segregative effect, the defendant's enforcement of the citizenship requirement in a city that has had virtually no Negroes since its incorporation has resulted in a public housing authority that has never had a Negro tenant despite being located in an area of Mobile County that has a substantial Negro population, a large proportion of whom are in serious need of public housing. The enforcement of the citizenship requirement has had a segregative effect. This conclusion is reinforced by the difficulty that some Negroes have had moving into Chickasaw and the high proportion of Negroes in the other public-housing facilities and on the waiting lists of such facilities within Mobile County. *See* Findings of Fact 103–121.

11. The history and background of racial exclusion in Mobile County serve as an additional *factor* in determining discriminatory intent or purpose. The citizenship requirement was adopted at a time when many other race-conscious practices were common in Mobile County. *Arlington Heights I*, 429 U.S. at 266–268, 97 S.Ct. at 563–565.[1] But, when a court is examining a record for discriminatory intent, care must be taken to avoid reacting viscerally. "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* at 266, 97 S.Ct. at 564.

12. Nothing in the sequence of events leading up to the adoption of the residency requirement indicates any invidious discrim-

inatory purpose motivated the commissioners. The paper trail offered by the Government, consisting of Board minutes of the commission, the cooperation agreement, and correspondence, proves nothing. The adoption of the residency requirement was consistent with substantive design of the new housing authority: to upgrade the Gulf Homes housing project.

■ 13. Balanced against those factors from which one could infer discriminatory intent is the unequivocal testimony of all the commissioners that no intent to discriminate was involved when the decision was made to adopt the residency requirement. *See* note 2 *infra.* The Court recognizes that the testimony of a defendant regarding his intent must be accepted cautiously. *Any* defendant can respond to a charge of discrimination with an *ad hoc* justification of subjective reasons tailored to purge the invidious intent. *Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d at 1040. *E. g., Hawkins v. Town of Shaw*, 461 F.2d 1171, 1172 (5th Cir. 1972) *(en banc) (per curiam)* (intent). In this case, the testimony of the commissioners impressed the Court as sincerely expressing their actual reasons for adopting the residency requirement. The testimony was that the residency requirement was adopted for several reasons. The residency requirement was intended to promote the interests of residents of Chickasaw in finding low-cost housing in a city which has boundaries that are geographically and politically limited. It was also intended to

---

1. Segregation of the races in education, housing, and public facilities and the wholesale exclusion of Negroes from the political process ended only by the intervention of the federal courts. *See e. g., Bolden v. City of Mobile*, 571 F.2d 238 (5th Cir. 1978), *cert. granted*, 439 U.S. 905, 99 S.Ct. 276, 58 L.Ed.2d 254 (1978); *Allen v. City of Mobile*, 331 F.Supp. 1134 (S.D.Ala. 1971); *aff'd.*, 466 F.2d 122 (5th Cir. 1972), *cert. denied*, 412 U.S. 909, 93 S.Ct. 2292, 36 L.Ed.2d 975 (1973) (racial discrimination by Mobile Police Department); *Sawyer v. City of Mobile*, 208 F.Supp. 548 (S.D.Ala.1961) (segregation of municipal golf course); *Evans v. Mobile City Lines, Inc.*, C.A. No. 2193–63 (S.D.Ala.1963) (segregation in public transportation); *Cooke v. City of Mobile*, C.A. No. 2634–63 (S.D.Ala. 1963) (segregation at city airport); *Preston v.*

*Mandeville*, 479 F.2d 127 (5th Cir. 1973) (racial discrimination in county-wide jury selection practices); *Davis v. Board of School Commissioners*, 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971) (segregation in Mobile County School System); *see also Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960) (racial gerrymandering of local government); *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) (racial gerrymandering of state government); *United States v. Alabama*, 252 F.Supp. 95 (M.D.Ala.1966) (Alabama poll tax). Despite this regretable history of discrimination, this defendant's alleged wrongdoing must not be prejudged. The Government would—to borrow from the criminal law—have this Court convict on the basis of mere presence.

stem the flow of undesirables who might try to move into the small community.[2] Both of these concerns are legitimate. They negate any discriminatory intent which might otherwise be inferred from the circumstantial evidence. Therefore, this Court holds that the residency requirement was not adopted by the defendant with the intent to discriminate on the basis of race.

### 2. Segregative Effect

14. "The Fair Housing Act prohibits not only direct discrimination but *practices* with racially discouraging effects . . . ." *United States v. Mitchell,* 580 F.2d 789, 791 (5th Cir. 1978) (emphasis added). The enforcement of the citizenship requirement has had a segregative effect. "Statistics, although not dispositive, 'have critical, if not decisive significance.'" (quoting *United States v. Northside Realty Associates, Inc.,* 518 F.2d 884 (5th Cir. 1975), *cert. denied,* 424 U.S. 977, 96 S.Ct. 1483, 47 L.Ed.2d 747 (1976)). "Therefore, a significant discriminatory effect flowing from rental decisions is sufficient to demonstrate a violation of the Fair Housing Act." *Id.* (citing *Metropolitan Housing Development Corp. v. Village of Arlington Heights,* 558 F.2d 1283 (7th Cir. 1977)).

15. The Fifth Circuit has not been clear as to whether every showing of a "significant discriminatory effect flowing from rental decisions" is a per se violation of the Act or whether the district court must balance the conduct which produced the dis-

criminatory impact against the policies underlying the Fair Housing Act. *Id.* at 791. Certainly the Fifth Circuit cases can be read as endorsing a rigid per se rule. In the only Fifth Circuit case on point since the Supreme Court's decision in *Arlington Heights I,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), the Fifth Circuit focused exclusively on the discriminatory effect. *United States v. Mitchell; cf. Dillion v. AFBIC Development Corp.,* 597 F.2d 556 (5th Cir. 1979) (racially motivated refusal where discriminatory intent existed); *Payne v. Bracher,* 582 F.2d 17 (5th Cir. 1978) (discriminatory intent). Prior to the *Arlington Heights I* the Fifth Circuit consistently held that discriminatory intent need not be shown in order to make out a violation of the Act. Only discriminatory impact need be shown to make out a violation of the Act. *United States v. Pelzer Realty Company, Inc.,* 484 F.2d 438, 443 (5th Cir. 1973), *cert. denied,* 416 U.S. 936, 94 S.Ct. 1935, 40 L.Ed.2d 286 (1974), *after remand,* 537 F.2d 841 (5th Cir. 1976) ("But it is not necessary to show that [the defendant] intended to deprive . . . . [the plaintiffs] of rights granted by the Act.").

16. After *Arlington Heights I* the Fifth Circuit has continued to focus on "racially discouraging effects" and "discriminatory effects". *United States v. Mitchell,* 580 F.2d at 791. However, in so focusing, the Fifth Circuit has cited *Arlington Heights II* and adopted the tort-type test—known as

---

**2.** Julian Livings defined undesirables as those addicted to drugs and prostitutes. He emphatically testified that race was not a consideration. James Q. Yance defined undesirables as people who were referred by the Mobile Housing Board who you "wouldn't be too happy to help." Undesirables also included people who cause "police problems". C. E. Burrell said that undesirables are people who other housing authorities didn't want, rabble rousers and trouble makers. Mr. Burrell said that since Chickasaw had "no black problem" there was never any reason to discuss whether the Board should purposely choose to exclude Negroes from the Chickasaw Housing Authority. Finally, Mayor J. C. Davis, when defining what he took to be "undesirables", said that undesirables were those people whom the city of Mobile was "dumping" in the city of Chickasaw.

Based upon the testimony of both the Mayor and the various commissioners, the Court concludes that the class against whom the commissioners sought to discriminate was not a racial class but was, instead, the class of social misfits who are ordinarily shunned by any community which is concerned with protecting its quality of life. No racial animus existed in the adoption of the residency requirement. *See United States v. West Peachtree Tenth Corp.,* 437 F.2d 221, 223–24 (5th Cir. 1971) (dictum) (recognizing the appropriateness of policies against admission of drunks, hippies, and other undesirables of any race as not contravening § 3604 so long as policy is not a smoke screen for unlawful discrimination).

the effects test—articulated by the Seventh Circuit in that case.[3] Instances where the effects test has been applied by the Fifth Circuit have been few. Only the *Mitchell* case applies the effects test. And it does so in a conclusory manner. In *Arlington Heights II* the Seventh Circuit held that " '[c]onduct that has the necessary and foreseeable consequences of perpetuating segregation can be as deleterious as purposefully discriminatory conduct in frustrating the national commitment [to fair housing].' " *Id.* (quoting *Arlington Heights II*, 558 F.2d 1283, 1289). Thus, it reasoned "that at least under some circumstances a violation of section 3604(a) can be established by a showing of discriminatory effect without a showing of discriminatory intent." *Arlington Heights II*, 558 F.2d at 1290.

17. In *Arlington Heights II*, the Seventh Circuit went on to reason that not "every action which produces discriminatory effects is illegal." 558 F.2d at 1290. The court rejected the per se rule. The Seventh Circuit articulated four factors which can be used to test whether conduct that produces a discriminatory impact, but taken without discriminatory intent, violates the Act.

> [The factors] are: (1) how strong is the plaintiff's showing of discriminatory effect; (2) is there some evidence of discriminatory intent, though not enough to satisfy the constitutional standard of *Washington v. Davis*; (3) what is the defendant's interest in taking the action complained of; and (4) does the plaintiff seek to compel the defendant to affirmatively provide housing for members of minority groups or merely to restrain the defendant from interfering with individu-

al property owners who wish to provide such housing.
*Id.*

### a. Showing of Discriminatory Effect

18. In *Arlington Heights II* the court noted two kinds of racially discriminatory effects which a facially neutral decision about housing can produce. The first discriminatory effect "occurs when that decision has a greater adverse impact on one racial group than on another." *Id.* The second discriminatory effect recognized by the court is the impact of the housing decision upon the community: if the housing decision perpetuates segregation and thereby prevents interracial association it is invidious under the Fair Housing Act independent of the extent to which it produces a disparate effect on different racial groups. *Id.*

19. Application of this factor in the instant case weighs in favor of the plaintiff. The decision by the Chickasaw Housing Authority to apply the residency requirement to applicants seeking housing certainly had a greater adverse impact on Negroes as against Caucasians. Chickasaw is populated almost exclusively by Caucasians. Any requirement that a person seeking public housing in Chickasaw already be a resident of Chickasaw will necessarily work to exclude all non-Caucasian people. Moreover, the decision by the Chickasaw Housing Authority to adopt and enforce the residency requirement worked to perpetuate the segregation of the Chickasaw community. The evidence shows that since the early 1940's Chickasaw has been predominately Caucasian. In light of the large number of Negroes who live in Mobile County—32.3% according to the 1970 census—one would expect that over the course of time, without

---

**3.** Every court of appeals which has dealt with the requirements of a prima facie case under § 3604 has adopted the effects test. *E. g., Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032 (2d Cir. 1979) (In an action brought by an individual plaintiff, the court reasoned that the only role which discriminatory motivation played in a § 3604 action occurred when a defendant attempted to rebut an individual plaintiff's prima facie case.); *Resident Adviso-*

*ry Bd. v. Rizzo*, 564 F.2d 126, 146–48 (3d Cir. 1977), *cert. denied*, 435 U.S. 908, 98 S.Ct. 1457, 1458, 55 L.Ed.2d 499 (1978); *Smith v. Anchor Bldg. Corp.*, 536 F.2d 231, 233 (8th Cir. 1976); *United States v. City of Black Jack*, 508 F.2d 1179, 1184–85 (8th Cir. 1974), *cert. denied*, 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975); *United States v. Youritan Construction Co.*, 370 F.Supp. 643, 648 (N.D.Cal.1973), *aff'd in part*, 509 F.2d 623 (9th Cir. 1975).

influence or pressure from outside sources, some Negroes would find their way into Chickasaw. That conclusion seems even stronger in light of the proximity of the city of Prichard, which, according to the 1970 census, is 50.5% Negro, to Chickasaw. The racial composition of Mobile County, including Prichard, vis-a-vis, Chickasaw have remained relatively constant since the mid-1940's. Thus, under either of the alternative prongs of this first factor the discriminatory effects which flow from the facially neutral decision to adopt and enforce the residency requirement strengthens the plaintiff's case for relief.

■ 20. The adoption and enforcement of a residency requirement is not a per se violation of the Act. The regulations of the public housing authority expressly provide for residency requirements.[4] In fact, they have a valid purpose in protecting the legitimate interests of the community by attempting to promote the interests of established community members vis-a-vis newcomers in the low-income public housing. The problem with this facially neutral requirement is in its application. The residency requirement has a greater adverse impact on Negroes, as well as all non-Caucasians, than it has on Caucasians. Since a statistically insignificant number of non-Caucasians live in Chickasaw at the present time the residency requirement will work to exclude non-Caucasians from ever establishing residency in the city of Chickasaw. Furthermore, the facially-neutral requirement perpetuates existing segregation.

*b. Discriminatory Intent*

21. The second factor which the *Arlington Heights II* court culled from previous cases brought under the Fair Housing Act is whether there is some evidence of discriminatory intent. Discriminatory intent is a slippery creature, difficult to prove.[5] The Seventh Circuit concluded that nowhere in the legislative history of the Fair Housing Act was there any indication that Congress intended that litigants prove discriminatory intent before they would be entitled to relief under the Act. 558 F.2d at 1289. Relying upon its interpretation of the legislative history, and the interpretations of the Act by other courts, the Seventh Circuit concluded that discriminatory intent need not be shown in order to prove a violation of the Act. Accordingly, the Seventh Circuit indicated that discriminatory intent should be discounted as against the other three factors.

22. The showing of discriminatory intent in this case is problematic. The members of the Chickasaw Housing Authority, without exception, testified that race and racial considerations were never a consideration in their adoption of the residency requirement. The testimony of the commissioners was that the residency requirement was adopted to protect the community from undesirables who might attempt to move into the public housing project. *See* note 2 *supra.* To repeat what this Court has already held, the evidence showed no discriminatory intent.

*c. The Governmental Interest*

23. When determining whether conduct which produced a discriminatory impact but which was taken without discriminatory intent violates the Act it is important to consider the interests of the defendant in taking the action which it took. "[I]f the defendant is a governmental body acting within the ambit of legitimately derived authority, [a court should be] less read[y to] find that its action violates the Fair Housing Act." 558 F.2d at 1293. Without doubt the Chickasaw Housing Authority was acting within the ambit of its legitimately derived authority when it adopted the residency requirement. *See* Ala.Code §§ 24-1-20 to 24-1-45 (municipal housing authorities). The residency requirement furthers

---

4. 24 C.F.R. § 841.115(c)(5) (HEW regulations regarding residency requirements).

5. *See e. g., Robinson v. 12 Lofts Realty, Inc.,* 610 F.2d 1032, 1040–43 (2d Cir. 1979) (suggest-ed approach when looking for intent in cases brought under Fair Housing Act); *Hawkins v. Town of Shaw,* 461 F.2d 1171, 1172 (5th Cir. 1972) (en banc) (per curiam).

important community concerns. Namely, the community is concerned about providing low-cost public housing for those within the community and, yet, at the same time it wishes to screen out the class of persons which most people would not choose to have as neighbors—drug addicts, prostitutes, and trouble makers. This third factor weighs heavily in favor of the defendant. *See* note 4 *supra*.

### d.  The Nature of the Relief Sought

24. The final factor considered by the Seventh Circuit in deciding whether, under the facts of a particular case, relief should be granted under the Fair Housing Act was the nature of the relief sought by the plaintiffs. It noted that where the plaintiff seeks to compel the defendant to construct integrated housing or to take certain affirmative steps to insure that integrated housing is built the courts ought to be reluctant to grant relief. Or, where the plaintiff seeks to require the defendant to appropriate money or to utilize land for particular purpose, then relief under the Act is likewise inappropriate. In short, where the plaintiff seeks a decree from the Court which would compel a defendant to take affirmative, involuntary action the courts ought to move reluctantly and cautiously. On the other hand, where a court is asked to strike down "nonintentional action by the state" which "interferes" with integrated housing then the Court ought to willingly do so. 558 F.2d at 1293.

25. In this case the plaintiffs are not asking that this Court order the Chickasaw Housing Authority to take affirmative action. Rather the plaintiffs are asking that this Court prohibit the Chickasaw Housing Authority from applying its residency requirement because that requirement, which is not intended to discriminate among applicants on the basis of race, nonintentionally does so. And this nonintentional action by the Chickasaw Housing Authority interferes with integrated housing, the quintessential goal of the Fair Housing Act. Thus, application of this final factor weighs heavily in favor of granting relief to the plaintiff.

### e.  The Balance

26. Analysis of the factors enumerated in *Arlington Heights II* leads the Court to the conclusion that the defendant has, through the adoption and application of the residency requirement, violated the Fair Housing Act. The residency requirement has an adverse impact on all non-Caucasians; it perpetuates segregation. Moreover, this Court is not being asked to order the Chickasaw Housing Authority to undertake some affirmative action. Instead, the plaintiff comes into this Court asking only that nonintentional action by the Chickasaw Housing Authority which interferes with integrated housing be enjoined. While no discriminatory intent has been shown the Seventh Circuit has expressly indicated that intent is to be discounted in balancing it against the other three factors. Finally, the legitimate interests which the Chickasaw Housing Authority had in adopting the residency requirement strongly weighs in favor of denying relief to the plaintiff. Taken as a whole the Court must conclude that the residency requirement adopted by the Chickasaw Housing Authority must give way to the prohibition in the Fair Housing Act that persons shall not be discriminated against on the basis of race in the rental of housing. The liberal construction applied to the Fair Housing Act by this Circuit, *United States v. Mitchell*, 580 F.2d 789 (5th Cir. 1978), and other Circuits, *see* note 3 *supra*, requires this Court to "decide close cases in favor of integrated housing." *Arlington Heights II*, 558 F.2d at 1294.

### E.  Constitutional Argument

27. In addition to the provisions of the Fair Housing Act, the plaintiff attacked the residency requirement on a Constitutional basis. The plaintiff argued that the residency requirement contravenes the Constitutional guarantee of the right to travel. *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). *See also Memorial Hospital v. Maricopa County*, 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306

(1974); *Dunn v. Blumstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972). Since the Court has decided this case on the basis of the statute it will be unnecessary to reach any decision on this Constitutional question.

### F. Remedies

██ 28. Having concluded that the defendant has violated the Act, the Court must now turn to the appropriate remedy. When fashioning equitable relief for the purpose of eliminating discriminatory effects the courts must be guided by the provisions and the purposes of the Fair Housing Act. The primary purpose of Title VIII is "to replace the ghettos 'by truly integrated and balanced living patterns.'" *Parkview Heights Corporation v. City of Black Jack,* 605 F.2d 1033, 1036 (8th Cir. 1979), *cert. denied,* 445 U.S. 905, 100 S.Ct. 1081, 63 L.Ed.2d 321 (1980) (quoting remarks of Senator Mondale, 114 Cong.Rec. 3422 (1968)). The remedial nature of the relief envisioned under Section 812(c) of the Fair Housing Act, 42 U.S.C. § 3612(c), was intended by Congress to eliminate the discriminatory effects of the past. *Albemarle Paper Company v. Moody,* 422 U.S. 405, 418–19, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975); *United States v. West Peachtree Tenth Corp.,* 437 F.2d 221, 222, 228 (5th Cir. 1971). The order which the Court enters in this case is intended to be limited to that which is necessary to eliminate as far as possible the discriminatory effects of the defendant's past violations of the Act and to insure its future compliance with the Act. Accordingly, the Court shall enter this 7th day of March, 1980 the following order.

### III. ORDER

#### I.

It is hereby ORDERED, ADJUDGED and DECREED that the defendant, the Housing Authority of the City of Chickasaw, its officers, directors, agents, employees, successors and all persons in active concert or participation with any of them are permanently enjoined from:

1. Requiring that applicants to the defendant be citizens or residents of the City of Chickasaw to be eligible for housing in the defendant Housing Authority;

2. Giving any priority or preference in assigning units to any applicants because an applicant is a citizen or resident of Chickasaw;

3. Refusing to rent or making unavailable or denying a dwelling to any person or representing to any person that a dwelling is not available to inspection or rental when the dwelling is, in fact, so available, because of race, color, religion, sex or national origin.

4. Discriminating against any person in the terms, conditions, or privileges or rental of a dwelling, or in the provision of services or facilities in connection therewith, on the basis of race, color, religion, sex or national origin;

5. Making, printing, publishing or causing to be made, printed or published any notice, statement or advertisement with respect to the rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex or national origin;

6. Interfering with any person in the exercise of, or on account of his having exercised or enjoyed, or on account of his having aided, or encouraged any other person in the exercise or enjoyment of rights granted or protected by the Fair Housing Act;

7. Instituting, continuing, enforcing or giving effect to any policy, procedure, rule, practice or criterion for eligibility for residence in the defendant Housing Authority which has the purpose or effect of making housing unavailable because of race, color, religion, sex or national origin.

#### II.

It is further ORDERED that the defendant shall take the following steps to notify the public of its nondiscriminatory policy within twenty (20) days of the entry of this Order:

1. Post and maintain fair housing signs in a form approved by the Secretary of the Department of Housing and Urban Development (hereinafter HUD) (24 C.F.R. § 110.1 *et seq.*) in the defendant's rental office;

2. Include on all outgoing correspondence of the defendant, the words "Equal Housing Opportunity", prominently placed and easily legible;

3. Place an advertisement no less than four inches by four inches in size in the *Mobile Press Register.* The advertisement shall state: a) the name, address and telephone number of the defendant; b) that the defendant operates 309 units of public housing; c) that admission to the defendant Housing Authority is no longer limited to Chickasaw residents; d) that all applicants, wherever their current residence is located, must meet uniformly applied eligibility criteria, including a maximum income limitation, required by HUD; e) that it is the defendant's policy to ensure equal housing opportunity for all persons, regardless of race, color, religion, sex or national origin;

4. Defendant shall instruct all of its employees to inform all individuals who inquire about housing at the Chickasaw Housing Authority in person or by telephone for one year after the entry of this decree that eligibility for housing is no longer limited to citizens of Chickasaw and that all applicants will receive equal consideration, regardless of the location of their current residence.

### III.

It is further ORDERED that the defendant shall post and maintain a notice in its rental office requesting that anyone who believes that any action or policy of the Chickasaw Housing Authority has resulted in discrimination against him/her on the basis of race, color, religion, sex or national origin notify the Executive Director of the Chickasaw Housing Authority or write to the General Litigation Section, Civil Rights Division, Department of Justice, 10th & Pennsylvania Avenue, N.W., Washington, D.C. 20530.

### IV.

It is further ORDERED that the defendant shall distribute public housing units on the basis of the date and time of application and other considerations not relating to location of present residence as prescribed by HUD with the following exception:

For ninety (90) days following the entry of this decree all black applicants to the defendant Housing Authority shall be considered as if they had applied for housing on March 5, 1979, the date on which this suit was filed. These applications shall be arranged in chronological order and all placed on the waiting list for the appropriate bedroom size unit as if they were received on that date, i. e., ahead of all applications received since March 6, 1979. This priority shall apply only to applications received within the first ninety days following the entry of this decree, but shall be permanent as to those applications.

### V.

It is further ORDERED that the defendant distribute to each current tenant a notice, to be approved by counsel for both parties, which shall explain that the citizenship requirement has been eliminated by Order of this Court and that it is the policy of the defendant not to discriminate on the basis of race, color, religion, sex or national origin. If the parties cannot agree upon the content of the notice both parties will submit suggested forms to the Court for its approval.

### VI.

It is further ORDERED that within thirty (30) days of the entry of this Order, the defendant shall do the following:

1. Conduct and complete an educational program for all employees to inform them of the provisions of this Order and their duties under the Fair Housing Act. Such program shall include:

(a) Furnishing to each employee a letter in a form to be agreed upon by counsel for the parties which shall summarize

the terms of this Order and of the Fair Housing Act. The proposed letter shall be submitted to the Court for its approval prior to distribution to the employees.

(b) Informing each employee, in person or by general meeting, of the provisions of this Order and of the duties of the defendant and its employees under the Fair Housing Act.

(c) Securing a signed statement from each employee that he or she has read the letter mentioned above, received the instructions described in the preceding paragraph, and in which each employee shall acknowledge that he or she understands that failure to comply with the provisions of this Order shall subject him or her to dismissal or other disciplinary action by his or her employer and to sanctions by the Court for disobedience of this Order. A copy of each such signed statement shall be sent to counsel for plaintiff.

2. Each new employee shall be instructed in accordance with the procedures set out in Section VI(1) above and shall be required to sign the statement set out in Section VI(1) above, within ten (10) days following his or her initial date of employment. Copies of all such signed statements will be furnished to counsel for plaintiff promptly upon execution.

## VII.

It is further ORDERED that the defendant shall do the following to enable plaintiff to monitor defendant's compliance with the terms of this Order:

1. Six months after the filing of this Order, and at six-month intervals thereafter, for two years from the date of the entry of this Order the defendant shall submit to the Court, along with a copy to the plaintiff, a report containing the following information:

(a) The address of each unit which has been vacated during the six-month period, together with an indication of the date it was vacated and the number of bedrooms it contained; the address of each unit which has been re-rented dur-

ing the previous six-month period, the date it was re-rented, the number of bedrooms each unit contained, and the race of the applicant assigned together with his initial date of application. The initial report under this paragraph shall provide the above information for all units which were vacant at the time this Order was filed, as well as those vacated within six months after such filing.

(b) The name, address and race of each person who applied for a unit during the previous six-month period, together with the following information:

(1) Date application submitted;

(2) Number of persons in family;

(3) Size of unit for which family is qualified;

(4) Monthly rent which family will be required to pay;

(5) Preference or priority to which application is entitled for reasons not related to this Order;

(6) If accepted for tenancy, addresses of units offered; size of unit assigned; date moved in;

(7) If not accepted for tenancy, date applicant was so informed; reasons not accepted;

(8) If accepted, but withdrew application, date of withdrawal;

(9) If accepted and placed on waiting list, date placed on waiting list.

2. Semi-annual reports filed pursuant to this Order shall also include all complaints of discrimination received by the defendant within the past six-month period and indication of action taken on the basis of the complaint.

## VIII.

It is further ORDERED that defendant shall preserve all records which are the source of, or contain, any of the information pertinent to defendant's obligations under this Order. Representatives of the plaintiff shall be permitted to inspect and copy all pertinent records of the defendant at any and all reasonable times, provided, however,

736

that the plaintiff shall endeavor to minimize any inconvenience to the defendant from the inspection of such records.

### IX.

It is further ORDERED that costs shall be assessed against the defendant.

DONE this 7th day of March, 1980.