# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 98-2861

_____

United States of America,    *
                             *
            Appellee,        *
                             *        Appeal from the United States
    v.                       *        District Court for the
                             *        Western District of Arkansas.
Big D Enterprises, Inc.;     *
Dr. Edwin G. Dooley,         *
                             *
            Appellants.      *


_____

Submitted: March 10, 1999
Filed: July 9, 1999

_____

Before RICHARD S. ARNOLD, FLOYD R. GIBSON, and HANSEN, Circuit Judges.

_____

HANSEN, Circuit Judge.

Following a trial in district court,[1] a twelve-person jury found that Big D Enterprises, Inc., and Dr. Edwin G. Dooley (collectively appellants) violated the Fair Housing Act (FHA) when they denied rental housing to applicants based on race. The

---

[1]The Honorable H. Franklin Waters, United States District Judge for the Western District of Arkansas, presiding.

jury awarded $1,000 in compensatory damages and $100,000 in punitive damages to three victims of appellants' discrimination. Big D Enterprises and Dr. Dooley appeal. We affirm.

## I.
## FACTS

Dr. Dooley owns three apartment complexes in Fort Smith, Arkansas. Dr. Dooley is also the president, sole officer, and sole shareholder of a corporation known as Big D Enterprises which manages the three apartment complexes, one of which is called Oak Manor. In October 1994, Richard Batts and Janet Poole sought to rent a two-bedroom apartment at Oak Manor. Cynthia Williams also sought to rent an apartment at Oak Manor. Although one of Big D's property managers, Carol Ragan, initially told Batts, Poole, and Williams that one or more apartments were available, all three applicants were later denied an opportunity to rent an apartment at Oak Manor. The rejection of Batts and Poole's and Williams' rental applications occurred after Big D executives discovered the race of the prospective tenants. Both Batts and Poole are black. Williams is white, but she is the mother of a biracial child. Big D later rented the apartment that Batts, Poole, and Williams were seeking to a white man.

Following the denial of her rental application, Williams filed a complaint with the United States Department of Housing and Urban Development (HUD) in which she alleged that Big D denied her housing based upon the race of her son. Ragan also filed a complaint with HUD in which she averred that Big D denied Batts and Poole an opportunity to rent at Oak Manor pursuant to Dr. Dooley's personal policy that forbade property managers from renting to black applicants. Ragan also informed HUD that Big D refused to rent to Williams because she is the mother of a biracial child and her ex-husband is black.

2

After investigating Ragan's and Williams' complaints, HUD found that appellants' acts of impermissible discrimination were not limited to Batts, Poole, and Williams. Rather, HUD determined that Big D and Dr. Dooley engaged in a pattern and practice of discriminating against minority housing applicants. The agency found that Dr. Dooley, his ex-wife, Elizabeth, and his stepdaughter, Tricia Turner, intentionally violated the Fair Housing Act, 42 U.S.C. §§ 3601-3631 (1994), when they ordered Big D property managers not to rent to prospective black tenants.

Upon completion of HUD's investigation, the Civil Rights Division of the United States Department of Justice (government) filed the instant action in district court against the appellants on behalf of Batts, Poole, and Williams. A trial ensued. Throughout the trial, Dr. Dooley continued to deny that he or Big D ever discriminated against a housing applicant based on the applicant's race. The jury rejected Dr. Dooley's denial defense and awarded damages to the three aggrieved applicants. Appellants moved for judgment as a matter of law, a new trial, or a remittitur of the punitive damage award. The district court denied appellants' motion in full and they now appeal.

On appeal, appellants contend that the jury's verdict contravenes the weight of the evidence, insufficient evidence exists to support the jury's verdict, the district court should have given a mixed motive instruction, the punitive damage award is excessive in relation to the compensatory damage award, the district court erred when it excluded certain evidence, the action is barred by the statute of limitations, and the district court abused its discretion when it sanctioned appellants for failure to comply with discovery orders.

## II.
## DISCUSSION

### A.

3

## Sufficiency and Weight of the Evidence

Appellants contend that the jury's verdict contradicts the weight of the evidence. They argue that the majority of the evidence introduced at trial supports their position that they did not discriminate against black applicants. Appellants also assert that the government failed to show by sufficient evidence that either Dr. Dooley or Big D engaged in a pattern or practice of impermissible discrimination as defined by the FHA. Appellants' assertions lack merit.

A party seeking to obtain a new trial based upon the weight of the evidence or a posttrial judgment as a matter of law based on the sufficiency of the evidence faces an onerous burden. We conduct de novo review of a district court's decision to deny a motion for judgment as a matter of law based on sufficiency of the evidence. See Denesha v. Farmers Ins. Exch.,161 F.3d 491, 497 (8th Cir. 1998), cert. denied, 119 S. Ct. 1763 (1999). In conducting our review, we view the evidence in a light most favorable to the verdict and we will not reverse a jury's determinations unless we find "that no reasonable juror could have returned a verdict for the non-moving party." Rockwood Bank v. Gaia, 170 F.3d 833, 840-41 (8th Cir. 1999) (internal quotations omitted). In addition, we must (1) evaluate the evidence in a light most favorable to the nonmoving party; (2) assume that all conflicts were resolved in the nonmoving party's favor; (3) assume as proved all facts tended to be proven by the nonmoving party's evidence; (4) give the nonmoving party the benefit of all reasonable inferences that may be gleaned from the proved set of facts; and (5) affirm the district court unless the evidence conclusively favors the moving party and is susceptible to no reasonable inference that will sustain the nonmoving party's position. See id. at 841. In contrast, we review a district court's decision to deny a motion for a new trial based upon the weight of the evidence under an abuse of discretion standard. See Pulla v. Amoco Oil Co., 72 F.3d 648, 656-57 (8th Cir. 1995). Hence, we will not disturb a district court's decision to deny a motion for a new trial unless we find that the jury's verdict

4

contravenes the great weight of the evidence to such an extent that allowing the verdict to stand will result in a miscarriage of justice. See Denesha, 161 F.3d at 497.

Proving a practice or pattern of discrimination requires the government to show that the defendant engaged in discriminatory activity as a matter of standard operating procedure. See International Bhd. of Teamsters v. United States, 431 U.S. 324, 336 (1977). Isolated or sporadic acts of discrimination are insufficient to prove a pattern or practice under the FHA. See United States v. Balistrieri, 981 F.2d 916, 929 (7th Cir. 1992), cert. denied, 510 U.S. 812 (1993).

In this case, the government has more than satisfied its burden of proof. Several of Dr. Dooley's apartment managers testified that Dr. Dooley personally instructed them not to rent to black applicants or—as Dr. Dooley referred to black applicants—"niggers." Some of the managers testified that, initially, they unwittingly rented to black applicants. When Dr. Dooley discovered his employees' actions, however, he angrily ordered them to tell black apartment seekers that no vacancies existed. Pursuant to Dr. Dooley's directives, the Big D employees repeatedly lied to black applicants who inquired about the availability of an apartment.

The managers testified that Dr. Dooley's ex-wife and stepdaughter often supervised their assignment of apartments in order to ensure that Dr. Dooley's exclusionary plans were implemented. In addition to Dr. Dooley, Elizabeth Dooley and Tricia Turner frequently referred to black people as "niggers" and vigilantly enforced Big D's "no blacks allowed" policy. Elizabeth Dooley explicitly told one manager not to rent to black people, anyone with a "raggedy car[,] or Vietnamese that looked like they couldn't pay the rent." (Trial Tr. Vol. 1, at 246.) Elizabeth Dooley told another manager that "she did not want any niggers or people that had ugly cars" or "anyone that was handicapped [who would] drag[] their feet across and ruin her carpet." (Trial Tr. Vol. 2, at 580.) Following Dr. Dooley's orders, managers utilized staff meetings to communicate the Dooley family's goal of excluding black applicants in an effort to

5

"clean the place up and get a better class of people." (Trial Tr. Vol. 1, at 178.)

When Richard Batts and Janet Poole initially applied for an apartment at Oak Manor, Carol Ragan testified that she was inclined to rent an apartment to them despite Dr. Dooley's orders. Ragan explained that Batts and Poole earned a combined income of $1,400 a month, and she believed that the couple would keep the apartment clean. When Ragan asked Tricia Turner for permission to rent to Batts and Poole, Turner responded by emphatically declaring, "No, no niggers whatsoever." (Trial Tr. Vol. 2, at 582).

Appellants' targeted discrimination extended beyond Batts and Poole. When Cynthia Williams applied to rent an apartment from Big D, she told Carol Ragan that she was the mother of a biracial child. Ragan responded by indicating that a biracial child may present a problem for the Dooleys. Ragan initially told Williams that a vacancy existed, and Williams began the process of relocating to Oak Manor. When Williams attempted to pay her deposit and obtain her key, Ragan and Dr. Dooley greeted her in the Oak Manor parking lot. Ragan informed Williams that Big D denied her application due to deficiencies in her credit history. The following day, however, Ragan explained to Williams that the actual reason for the denial of her application was the race of her child. Ragan stated that when she asked Turner about the possibility of renting to a white woman who is the mother of a biracial child, Turner responded by saying that she did not want a black child living at Oak Manor, and she did not want Williams' black ex-husband "hanging around." (Trial Tr. Vol. 2, at 584.)

Taking the evidence of the discrimination leveled against the three identified victims together with the testimony of the Big D employees, it is apparent that the government conclusively demonstrated a pattern and practice of discrimination against black housing applicants. Appellants argue, however, that we should disregard most of the government's evidence because the government's testifying witnesses lacked

credibility. In particular, appellants assail the character of Carol Ragan by labeling her a convicted felon and a person who bore "enormous personal animosity" toward Elizabeth Dooley. (Appellants' Br. at 15.) Appellants casually remark in their brief that "Ragan quit and left a note calling Elizabeth Dooley a blood sucking slut." (Appellants' Br. at 2.) Appellants' attack on the character of the government's testifying witnesses not only is irrelevant, it demonstrates a panoptic misunderstanding of the role of an appellate court in evaluating the sufficiency of the evidence. Appellate courts do not weigh the credibility of witnesses. See Triton Corp. v. Hardrives, Inc., 85 F.3d 343, 345 (8th Cir. 1996). The jury is the sole arbiter of the truthfulness or believability of a witness's testimony. See Morse v. Southern Union Co., No. 98-2050, 1999 WL 212844, at *3 (8th Cir. Apr. 14, 1999). The jury also determines what weight to assign to a particular witness's testimony. See id. This court's role is limited to determining if there is sufficient evidence to support the jury's verdict and if the jury's verdict contradicts the great weight of the evidence. See Denesha, 161 F.3d at 497. As we previously stated, the evidence is more than sufficient in this case. In fact, overwhelming evidence exists to support the jury's verdict. Accordingly, appellants' challenge to the sufficiency and weight of the evidence fails. The district court committed no error in denying the appellants' post-trial motions for judgment as a matter of law or for a new trial.

## B.
## Mixed Motive Instruction

Appellants argue that the district court erred when it refused to grant their request for a mixed motive jury instruction. Specifically, appellants argue that they denied Cynthia Williams an opportunity to rent an apartment because she did not complete her housing application correctly. Appellants claim that the jury should have been able to consider whether the faulty application was the actual reason for Big D's

7

rejection of Williams.[2] We review a district court's decision regarding jury instructions for abuse of discretion. See Morse, 1999 WL 212844, at *7.

Under a mixed motive analysis, a defendant must present sufficient evidence for a jury to conclude that the defendant's adverse actions against the plaintiff were motivated by a legitimate reason. See Price Waterhouse v. Hopkins, 490 U.S. 228, 252 (1989) (plurality). When evidence of permissible and impermissible motives are present, a defendant will be held liable unless it can show that it would have taken the same action against the plaintiff regardless of the improper motive. See id.; Kris v. Sprint Communications Co., Ltd. Partnership, 58 F.3d 1276, 1280 (8th Cir. 1995). Submission of a mixed motive jury instruction is not warranted if a defendant has failed to present sufficient evidence of a legitimate motive for the adverse decision. See Buchholz v. Rockwell Int'l. Corp., 120 F.3d 146, 149 (8th Cir. 1997).

Dr. Dooley and Big D failed to provide sufficient evidence of a legitimate motive in this case. Appellants assert that application deficiencies served as the legitimate reason for the denial of Williams' housing application. Appellants' assertion is not supported by the record. Williams testified that she remembers filling out Big D's housing application form, but she does not recall whether she completed all the items contained on the form. Such a statement hardly constitutes sufficient evidence that Williams' application was deficient or that a deficiency played any role in the decision

---

[2]Appellants argue on appeal that they should be entitled to a mixed motive instruction regarding the denial of Batts and Poole's application. Appellants contend that Batts and Poole also failed to complete correctly their housing application. Appellants assert that the failure to complete the application in a proper manner served as a legitimate basis for the denial of housing to Batts and Poole. We note, however, that appellants did not raise the issue of Batts and Poole's application before the district court. We decline to address issues raised for the first time on appeal. See Carter v. Chrysler Corp., 173 F.3d 693, 704 n.9 (8th Cir. 1999). Hence, appellants' mixed motive arguments with respect to Batts and Poole must fail.

to deny her housing at Oak Manor.  Dr. Dooley and Big D offered no witnesses to explain Oak Manor's policy regarding the proper completion of housing applications, and no witness corroborated appellants' allegation that deficiencies in Williams' housing application contributed to her rejection.  Appellants' naked assertion without more is not sufficient evidence of a legally permissible motive.  Accordingly, the district court properly denied appellants' request for a mixed motive jury instruction.

## C.
### Punitive Damages

Appellants contend that the district court erred when it declined to apply Arkansas law as the mechanism for assessing punitive damages under the FHA. Appellants further contend that the district court contravened Arkansas law when it permitted the government to introduce evidence of the net worth of both Big D and Dr. Dooley for the purpose of calculating punitive damages.  We review de novo a district court's conclusions regarding choice of law.  See American Home Assur. Co. v. L & L Marine Serv., Inc., 153 F.3d 616, 618 (8th Cir. 1998).

The cause of action in this case arises from the FHA.  The FHA is a federal act allowing for the assessment of punitive damages against persons who engage in housing discrimination.  See 42 U.S.C. § 3613(c)(1)(1994).  When a federal statute  provides a remedy, the scope of the remedy is interpreted in accordance with federal  law.  See Burnett v. Grattan, 468 U.S. 42, 55 n. 18 (1984).  Appellants argue, however, that there is a difference between the scope of the remedy and the assessment of that remedy. Even assuming, without deciding, that appellants have correctly identified an interstice in the punitive damage provision of the FHA, it is not appropriate to apply state law in this context.  The application of state law to the assessment of punitive damages under the FHA would yield inconsistent results between the states and thwart the even-handed application of the FHA's anti-discrimination provisions.  Cf. Kamen v. Kemper

9

Fin. Servs., Inc., 500 U.S. 90, 98 (1991) (noting that filling the interstices of federal remedial schemes with state common law is not appropriate when a uniform national standard is needed or application of state law would frustrate a federal program's specific objectives). Hence, the assessment of punitive damages under the FHA is governed by federal rather than state law. Under federal law, evidence of a defendant's financial worth is traditionally admissible for the purpose of evaluating the amount of punitive damages that should be awarded. See City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 270 (1981). Therefore, we find no error.

Appellants also claim that the district court erred in denying their motion to remit the punitive damage award. Appellants characterize the award as "grossly excessive" and claim that it violates their due process rights under the United States Constitution. The district court concluded that the award comports with due process. We review the district court's conclusions de novo. See Midland Banana & Tomato Co., Inc. v. United States Dep't of Agric., 104 F.3d 139, 142 (8th Cir.), cert. denied, 118 S. Ct. 372 (1997).

Appellants premise their due process challenge primarily on the ratio of the punitive damage award to the compensatory damage award. The jury awarded Cynthia Williams a total of $500 in compensatory damages against both defendants. The jury awarded Williams $25,000 in punitive damages against Dr. Dooley and $25,000 in punitive damages against Big D. The jury also awarded Batts and Poole, collectively, a total of $500 in compensatory damages against both defendants. Batts and Poole, collectively, also received a $25,000 punitive damage award against Dr. Dooley and a $25,000 punitive damage award against Big D. Appellants argue that aggregating the punitive and compensatory damage awards yields a ratio of 100 to 1. Relying on Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1 (1991), appellants contend that an award in excess of a 4 to 1 ratio violates substantive due process. Once again, appellants misconstrue the applicable law.

10

Consistent with the Supreme Court, we eschew facile reliance on mathematical formulas for determining the appropriateness of punitive damage awards.  See BMW of N. Am, Inc. v. Gore, 517 U.S. 559, 582 (1996).  Although the ratio of compensatory to punitive damages is not irrelevant, it is simply one factor that a court  must consider when evaluating whether a punitive damage award violates due process.  See id. at 582-83.  Courts must also consider the reprehensibility of the defendants' misconduct and the extent to which the punitive damage award varies from the range of possible sanctions that may be imposed for comparable misconduct.  See id. at 575, 583-84.  The relative strength or weakness of the other factors naturally impacts upon the acceptability of the punitive to compensatory damage award ratio.  In cases where the other factors are weak, a 4 to 1 ratio may test the outer limits of acceptability.  See Haslip, 499 U.S. at 23.  In cases where the other factors are strong, a 526 to 1 ratio may be appropriate. See TXO Prod. Corp. v. Alliance Resources Corp., 509 U.S. 443, 459-62 (1993); see also Dean v. Olibas, 129 F.3d 1001, 1007-08 (8th Cir. 1997) (upholding a 14 to 1 punitive to compensatory damages ratio).

In this case, the overall strength of the BMW factors justifies the punitive damage award.  In terms of the similarity between the punitive damage award and the penalties available for comparable misconduct, we need look no further than the FHA itself.  The FHA allows courts to impose a fine in addition to compensatory and punitive damages for violations of the act. The maximum fine permitted for a first time offense is $50,000.  See 42 U.S.C. § 3614(d)(1)(C)(i).  The total punitive damage award imposed against each defendant in this case was $50,000.  The fact that the FHA permits courts to impose a fine up to $50,000 in addition to compensatory and punitive damages significantly undercuts appellants' argument that the punitive damage award in this case is excessive.  Cf. Haslip, 499 U.S. at 23  (upholding a punitive damage award even though it far exceeded the statutory fine limit).  We note that the district court declined to impose a fine because the jury had returned the amount of punitive damages it did.

11

Appellants' argument is also significantly undercut by the remaining BMW factor. The Supreme Court identified the degree of reprehensibility of the defendants' conduct as perhaps the most important factor that courts should consider when evaluating whether a punitive damage award comports with due process. See BMW, 517 U.S. at 575. In this case, the reprehensibility of appellants' conduct more than justifies the punitive damage award. Characterizing Big D and Dr. Dooley's actions as egregious may be an understatement. Big D and Dr. Dooley directly engaged in the systematic and deliberate exclusion of an entire race of people. Such action exemplifies racism in its rawest form. Appellants' acts of intentional racial discrimination demonstrate that this society's goal of providing housing free of racial bias has yet to be achieved. Punitive damage awards help ensure that citizens who engage in such contemptible behavior against other citizens receive society's full rebuke and condemnation. The punitive damage award in this case promotes such an outcome and reinforces the nation's commitment to protecting and preserving the civil rights of all. Accordingly, after evaluating the BMW guidepost factors as a whole, we conclude that the district court committed no error in denying appellants' request for remittitur. The punitive damages stand.

## D.
### Evidentiary Exclusions

Appellants contend that the district court erred when it excluded some of their proffered evidence. Specifically, the district court denied appellants' requests to admit evidence of a HUD administrative determination, a pamphlet distributed by the government, and the testimony of a witness identified for the first time at trial. We review a district court's decision regarding admissibility of evidence for clear abuse of discretion. See Spencer v. Stuart Hall Co., Inc., No. 98-1832, 1999 WL 199423, at*5 (8th Cir. Apr. 12, 1999).

Appellants' first evidentiary challenge concerns the district court's decision to exclude evidence of a HUD administrative determination. The administrative determination emanates from a complaint filed in 1996 by an interracial couple against Big D. The couple resided at Oak Manor and claimed disparate treatment based on their race.[3] HUD reviewed the couple's complaint and found "no cause" for further action against Big D or Dr. Dooley. Appellants argue that HUD's "no cause" finding constitutes probative evidence of an absence of discrimination in this case. Appellants' argument strains logic. The couple did not file their complaint against appellants until two years after the culmination of the acts that form the basis for the pattern and practice of discrimination alleged in the instant case. Hence, the administrative determination that resulted from the couple's complaint not only is irrelevant to the instant case, its admission poses a danger of confusion and undue prejudice. See United States v. Noske, 117 F.3d 1053, 1058 (8th Cir.), cert. denied, 118 S. Ct. 315 (1997), and 118 S. Ct. 389 (1997), and 118 S. Ct. 1060 (1998). Accordingly, the district court acted properly by excluding such evidence.

Next, appellants challenge the district court's decision to exclude an investigatory pamphlet distributed by the government. During the discovery phase of this case, the government circulated a pamphlet in an attempt to seek further information about appellants' pattern and practice of housing discrimination. The government's pamphlet garnered no response. Appellants argue that the absence of a response signals an absence of discrimination. We disagree. The absence of a response to the government's inquiry hardly proves that appellants did not engage in a pattern and practice of discrimination. Rather, the absence of a response indicates only that the government could not locate any additional witnesses who were willing to provide further information against Big D or Dr. Dooley. It does not disprove the government's

---

[3]The government claims that following Cynthia Williams' complaint with HUD, appellants retreated from their "no blacks allowed" policy in an effort to camouflage their prior acts of discrimination.

assertion of housing discrimination. Any minimal benefit that such evidence may inure to appellants is far outweighed by the potential for confusion and prejudice. See Fed. R. Evid. 403; Noske, 117 F.3d at 1058. Therefore, the district court did not abuse its discretion by excluding the evidence.

Appellants' final evidentiary challenge involves the district court's decision to disallow the testimony of a "newly discovered" witness. During the trial, appellants' attorney's wife remembered the name of an individual who, she claims, could testify that he saw biracial children living at Oak Manor. The district court declined to permit the individual's testimony. The district court committed no error.

It is a well-established rule in this circuit that district courts have broad discretion to exclude the testimony of a witness who was not disclosed prior to trial. See Blue v. Rose, 786 F.2d 349, 351 (8th Cir. 1986); Admiral Theatre Corp. v. Douglas Theatre Co., 585 F.2d 877, 897-98 (8th Cir. 1978). In this case, the district court found that allowing the testimony of the witness would be unfairly prejudicial to the government. We agree. We also note that, notwithstanding counsel's wife's late remembrance, appellants have not provided a compelling reason for not listing the potential witness prior to trial. Finally, we believe that the substance of the proposed testimony is merely cumulative evidence. Multiple witnesses testified in support of appellants' contention that they did not engage in a pattern and practice of racial discrimination. In view of the strength of the evidence against Big D and Dr. Dooley, it is rather implausible to suggest that the testimony of one additional defense witness would be outcome determinative. On more than one occasion, we have upheld a district court's decision to disallow the testimony of an eleventh-hour rebuttal witness. See Sterkel v. Fruehauf Corp., 975 F.2d 528, 532 (8th Cir. 1992); Blue, 786 F.2d at 351; Admiral Theatre, 585 F.2d at 897-98. We find no reason to disturb the district court's decision to exclude the testimony of a cumulative defense witness proffered well past the stroke of midnight.

# E.
## Statute of Limitations

Appellants argue that the government's claim is barred by the statute of limitations. Appellants failed to raise the statute of limitations argument until their posttrial motion for remittitur. A defense based upon the statute of limitations is generally waived if not raised in a responsive pleading. See Fed. R. Civ. P. 8(c); Myers v. John Deere Ltd., 683 F.2d 270, 273 (8th Cir. 1982). Appellants offer no plausible justification for their failure to raise the statute of limitations defense in a responsive pleading. Accordingly, we agree with the district court's conclusion that appellants waived any statute of limitations defense they may have had.

# F.
## Discovery Sanction

Appellants assert that the district court erred when it awarded the government attorney's fees and costs in the amount of $1,899 in conjunction with the government's discovery motion. The district court assessed attorney's fees and costs against Big D and Dr. Dooley, jointly, based upon their failure to produce documents and respond to the government's discovery requests. See Fed. R. Civ. P. 37. The district court reached the $1,899 figure after calculating, at a rate of $125 per hour, the total number of hours that the government's attorneys spent preparing their discovery motion, combined with expenses associated with legal database research. The district court found that a rate of $125 per hour appropriately represents the government attorney's experience and the local market rates. Appellants contend that the district court incorrectly determined the hourly rate.

Federal Rule of Civil Procedure 37 grants a district court wide discretion to impose sanctions for a party's failure to comply with discovery requests, and we will

15

not reverse a district court's order with respect to sanctions, absent a clear abuse of discretion. See Collins v. Burg, 169 F.3d 563, 565 (8th Cir. 1999). "We are especially reluctant to substitute our judgment for that of the district court in the matter of appropriate attorney's fees, because the district court is in the best position to determine whether hours were reasonably expended and whether an attorney's hourly rates are reasonable within the context of the relevant community." Id.

Appellants argue that the district court's determination of the hourly rate is unreasonable. Appellants contend that a district court should calculate the hourly rate in accordance with the value that the government places on its attorney's time. Appellants assert that an hourly rate of $125 for 15 hours of time "scales to an annual salary of $260,000 for a staff employee of the Justice Department." (Appellants' Br. at 48). Appellants' argument makes scant sense. It is axiomatic that attorney billing rates do not correlate with annual salary because an attorney's billing rate is designed to cover more than the attorney's net income expectations. Moreover, we have long recognized that the hourly rate of the local legal community may serve as a benchmark for determining the amount of attorney's fees to be imposed upon a party. See Moore v. City of Des Moines, 766 F.2d 343, 346 (8th Cir. 1985), cert. denied, 474 U.S. 1060 (1986). We see no reason why the government should not be able to recover a reasonable fee for its attorney's work calculated at the same rate that the attorney would be compensated by the prevailing local economy. In examining the hourly rate of the local legal community, it is irrelevant whether counsel seeking the attorney's fees is employed by the private or public sector. What matters is the attorney's experience and ability. We find that the district court committed no error in its sanction award.

### III.
### CONCLUSION

For the reasons stated herein, we affirm the judgment of the district court.

16

A true copy.

Attest:

     CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.