**UNITED STATES of America,**
**Plaintiff,**

v.

**GARDEN HOMES MANAGEMENT, CORP.; Joseph Wilf; Westbound Homes, Inc.; Redstone Garden Apartments, Inc.; and Cathy Rosenstein, Defendants.**

CIV.A. No. 99–2900 (JCL).

United States District Court, D. New Jersey.

Aug. 10, 2001.

Eric I. Halperin, Washington, DC, for plaintiff.

Peter William Till, Law Office of Peter William Till, Springfield, NJ, for defendants.

## OPINION & ORDER

LIFLAND, District Judge.

Defendants Garden Homes Management Corp., Westbound Homes, Inc., Redstone Garden Apartments, Inc., Joseph Wilf and Cathy Rosenstein move for summary judgment dismissing this housing discrimination action. They argue that summary judgment is appropriate because plaintiff, the United States of America ("the Government"), has not presented sufficient proof to establish that they engaged in a "pattern or practice" of discriminatory conduct. The Government disagrees and submits that the results of its fair housing tests, coupled with substantial independent evidence, show that defendants discriminated against prospective tenants on the basis of race and familial status. Defendant Wilf also seeks summary judgment. He contends that he cannot be held liable for the alleged misconduct of his rental agent. Once again, the Government disagrees. For the following reasons, Defendants' motion is denied in its entirety.

### I. BACKGROUND

A. *The Parties*

This housing discrimination action involves three apartment complexes located in Parsippany, New Jersey: Lakeview Garden Apartments, Redstone Garden Apartments and Westgate Garden Apartments (collectively "the Subject Properties"). (Fi-

nal Pretrial Order at § 3, p. 5.) [1] The first complex, Lakeview Garden Apartments, is a 214-unit property that contains two bedroom apartments. (*Id.*) JHW Associates, a partnership, owns the Lakeview complex. Defendant Wilf is a partner at JHW Associates. (*Id.* at p. 6.) The second, Redstone Garden Apartments, comprises 92 units, some of which are two bedrooms. (*Id.* at p. 5.) Defendant Redstone Garden Apartments, Inc. owns the Redstone complex. (*Id.*) The final complex, Westgate Garden Apartments, has 152 units. Like the others, it offers two bedroom apartments. (*Id.*) Defendant Westbound Homes, Inc. owns the Westgate property. Defendant Wilf is an officer of Westbound Homes.

Defendant Garden Homes Management Corp. manages the Lakeview, Redstone, and Westgate complexes. (*Id.* at p. 6.) It is responsible for establishing rental policies, supervising staff, maintaining vacancy information, evaluating rental applications, and keeping tenant files for each property. (*Id.*) During 1998, Defendant Wilf served as an officer of Garden Homes. (*Id.*)

Defendant Rosenstein, an employee of JHW Associates, serves as the rental agent for the Subject Properties. (*Id.* at p. 5.) In this capacity, she disseminates vacancy information and shows apartments to interested parties; provides rental applications and information about how to complete them; and verifies answers that applicants furnish. (*Id.*) The Subject Properties have one rental office, which is located at the Lakeview complex. (*Id.*)

1. The Court draws some of this background from the Final Pretrial Order ("PTO").

2. A fair housing test involves "individuals who, without an intent to rent or purchase a home or apartment, pose as renters or purchasers for the purpose of collecting evidence of unlawful steering practices." *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982).

## B. *The Fair Housing Tests*

In April 1998, the United States Department of Justice, in tandem with the Northern New Jersey Fair Housing Council, began investigating the Subject Properties. The inquiry spanned one month and consisted of three fair housing tests. (*Id.* at p. 6.) These tests, along with subsequent investigation, allegedly revealed racial discrimination as well as discrimination against applicants with small children.[2]

All of the tests occurred in roughly the same way. (Defendants' Statement of Material Facts at ¶ 24.) On each occasion, an African-American tester inquired about the availability of a two bedroom apartment at the Subject Properties, only to be informed that such units were not available. Within twenty-four hours, a white tester arrived and made the same inquiry. The white tester was told that a two bedroom apartment was available--or would likely become available--and was encouraged to apply. The specific details of each test are as follows.[3]

### 1. *The April 1998 Test*

On April 8, 1998, an African-American female tester went to the rental office and asked whether any two bedroom units were available. Defendant Rosenstein replied that "I hate to tell you. The two bedrooms are at a premium. At a premium. I must have 20 people ahead of the line." (Decl. of Eric I. Halperin at Ex. A, p. 2, ln. 13-15.) [4] She further explained that

3. Defendants do not controvert the Government's version of the fair housing tests that occurred, presumably because those tests were tape-recorded. They do, however, dispute the legal significance of the tests.

4. As noted, the Government's testers recorded their conversations with Defendant Rosenstein. Defendants recently moved to bar those recordings. Magistrate Judge Stanley R. Ches-

"two bedrooms are very hard in Parsippany. That's my only problem. I have none at this time." (*Id.* p. 4, ln. 7-9.) She agreed to place the tester on a waiting list, but cautioned that "if you had little children, we would have to only consider you for the first floor." (*Id.* at p. 3, ln. 8-10.)

A white tester visited the rental office the next morning. She also met with Defendant Rosenstein, who informed her that "the only thing I have, to be very honest with you, is a 2 bedroom here and they're very hard to come by." (*Id.* at Ex. B., p. 3, ln. 4-6.) Defendant Rosenstein then engaged in sales talk to persuade the tester to take the apartment. (*See, e.g., id.* at p. 4, ln. 8-11.)

### 2. *The May 6, 1998 Test*

On May 6, 1998, an African-American female tester visited the rental office. She inquired about two-bedroom units for June 1, 1998. Defendant Rosenstein announced that "right now two bedrooms are at a premium . . . I don't think there's one complex here in Parsippany that has a two bedroom. That's how bad it is." (*Id.* at Ex. C. p. 2, ln.11-16.) Defendant Rosenstein promised to put the tester on a waiting list, but warned her that the list had at least twenty names on it already. (*Id.* at p. 2, ln. 18-24.) The tester then asked for a rental application, but Defendant Rosenstein refused to provide one, declaring that it was not her policy to distribute applications. (*Id.* at. p. 11, ln. 1-7.)

Several hours later, a white tester went to the rental office and asked about a two bedroom for June 1, 1998. Defendant Rosenstein said that she would probably have a unit available for that date and, if not, that one would be vacant for June 15. (*Id.* at Ex. D., p. 3, ln. 1-7; p. 9, ln. 12-22; p. 10, ln. 5-7.) She then showed the tester the apartment—which was the same unit offered to the white tester involved in the April 1998 test—and gave the tester a rental application. (*Id.* at. p. 18, ln. 5-9.) In addition, Defendant Rosenstein questioned the tester closely about her family composition to verify that the tester did not have children. (*Id.* at p. 1, ln. 15-19.)[5]

### 3. *The May 8, 1998 Test*

The Government's final test occurred on May 8, 1998. On that date, an African-American male tester went to the rental office and asked for a two bedroom apartment. Defendant Rosenstein immediately retorted that "you are going to have one heck of a time . . . It's impossible for a two bedroom. Impossible. They're very, very, very hard to come by. I hate to tell you. I can take your name, but I have to tell you there's a long list." (*Id.* at Ex. E, p. 2, ln. 12 18.) She then directed him to other apartment complexes in the area.

A white tester arrived at the rental office less than two hours later. He asked for a two bedroom apartment in mid-June, but was told that it would be difficult to find a vacancy. (*Id.* at Ex. F, p. 2, ln. 14-22.) Defendant Rosenstein then showed the

---

ler denied that motion in a Letter Opinion dated May 18, 2001. He found that the recordings, and transcripts thereof, would be admissible provided the Government lays the proper foundation at trial. This Court agrees and will assume for the purposes of this motion that the recordings and transcripts are admissible.

5. Their dialogue went as follows:
[Defendant Rosenstein]: Any children?

| [Tester]: | No. |
| [Defendant Rosenstein]: | That's important. |
| [Tester]: | No children. |
| [Defendant Rosenstein]: | Okay. |

(Halperin Decl. at Ex. D, p. 2, ln. 15-19.)

tester an apartment that might be available for that date--the same apartment that she showed to each of the prior white testers--but informed him that two other individuals were interested and that they had priority. (*See, e.g., id.* at p. 12, ln. 18-20.) She suggested that the tester could have the apartment if the other individuals did not take it and told him what he needed to do to obtain a lease. (*Id.* at p. 6, ln. 9-13.) Defendant Rosenstein also gave the tester a rental application. (*Id.* at ln. 19-21.) On May 13, 1998, Defendant Rosenstein called the tester to find out if he was still interested in the apartment. (*Id.* at Ex. G, p. 2, ln. 17-24.)

## C. *The Government's Subsequent Investigation*

The Government developed evidence in addition to the results of its fair housing tests.[6] The investigation identified Steven Jackson as a racial discrimination victim. Mr. Jackson, an African-American, avers that he went to the rental office in early January 1999 seeking a two-bedroom. (*Id.* at Ex. H, ¶ 3.) Defendant Rosenstein allegedly told him that she did not have anything available. (*Id.* at ¶ 4.) However, after receiving notice of the Government's intention to file this suit, (*Id.* at Ex. K), Defendant Rosenstein contacted Mr. Jackson and offered him an apartment, (*Id.* at Ex. H, ¶ 6).

In addition to Mr. Jackson, the Government located Patricia Dacres, an African American mother of one. (*Id.* at Ex. I, ¶¶ 2-4.) Ms. Dacres declares that she went to the rental office in April 1999 looking for a two bedroom for herself, her husband, and her infant son. (*Id.*) She walked through an available second floor apartment and subsequently obtained an application. After she disclosed that she had a young child, Defendant Rosenstein tried to dissuade her from taking the unit. (*Id.* at ¶¶ 8-9.) Ms. Dacres then left the rental office and completed the application. She returned several days later, at which time Defendant Rosenstein "attempted to discourage [her] from renting the second floor apartment that [she] was applying for. [Defendant Rosenstein] stated, that children should be on the first floor. [Defendant Rosenstein] said, in fact it's illegal to rent to children on the second floor and that she had no first floor apartment available." (*Id.* at ¶ 10.) Garden Homes ultimately denied Ms. Dacres' tenancy application. (*Id.* at ¶ 14.)

The Government also identified witnesses who will testify that Defendants adhered to a policy of discrimination against families with small children. For example, Rodney Lynch, a current first-floor resident of the Lakeview complex, asserts that Defendant Rosenstein told him that he could not rent a second-floor unit because he had children. (*Id.* at Ex. S, ¶ 7.) Jacquelyn Footman, a former first-floor Lakeview tenant, allegedly experienced similar treatment. (*Id.* at Ex. U, ¶ 5.) Finally, and most significantly, Defendant Rosenstein herself expressed a preference for keeping families with small children off the upper floors of the Subject Properties. During her deposition she testified that she followed this policy and that her supervisor knew as much. (*Id.* at Ex. J, p. 122, ln. 17 to p. 123, ln. 22.) However, she reiterated that her policy was not iron-clad and that she never refused to rent apartments because of the presence of children.

---

**6.** Once again, Defendants do not contradict the substance of the Government's additional evidence. Rather, they dispute its legal significance and the inferences that may reasonably be drawn from it.

## D. *Procedural History*

Based on its fair housing tests and subsequent investigation, the Government filed suit on June 21, 1999. It accuses Defendants of violating the Fair Housing Act by committing racial and familial status discrimination. It seeks a combination of legal and equitable relief to remedy these alleged wrongs.

Defendants submit that the record contains insufficient evidence that they followed a pattern or practice of discrimination on any basis. Because the establishment of a pattern or practice is a predicate for liability under the Fair Housing Act, they argue that the Government cannot prevail as a matter of law. Accordingly, Defendants move for summary judgment.

Defendant Wilf also pursues summary judgment. He contends that he cannot be held accountable for the illicit acts of his rental agent and that dismissal is warranted as to him.

## II. *STANDARD OF REVIEW*

Summary judgment is a procedural tool that obviates the need for trial by identifying and disposing of groundless claims and defenses. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Relief is warranted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). To resist, the adverse party must set forth specific facts that demonstrate the existence of a genuine issue for trial and may not rest on bare allegations or unsubstantiated defenses. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Fed. R. Civ. P. 56(e).

The existence of mere factual disputes does not preclude relief. Once the proponent discharges its Rule 56(c) duty, the burden shifts to the adverse party to show that material facts are genuinely controverted. *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Materiality and genuineness are the touchstones of summary judgment law.

The Court does not resolve genuine issues of material fact on a summary judgment motion. Rather, it only determines if such issues exist. *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. 2505. To determine whether the proofs create a jury question, the Court must take into account the apposite evidentiary burden. *Id.* at 254–55, 106 S.Ct. 2505. If the proofs presented would permit a jury applying the governing evidentiary standard to find for the adverse party, then a genuine factual dispute exists. *Id.* at 255, 106 S.Ct. 2505. Whether those disputed facts are material depends on the applicable law. *Id.*

Because summary judgment involves a pretrial adjudication on the merits, the adverse party enjoys the benefit of various procedural protections. For example, the Court must view the evidence in the light most favorable to the adverse party and accord that party the benefit of all legitimate inferences. *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348. Moreover, the Court may not take credibility issues from the jury. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505.

Because the record contains substantial evidence of discrimination, from which a jury could find a pattern or practice of misconduct, Defendants' summary judg-

ment motion must be denied. Defendant Wilf's individual application also fails.

## III. *DISCUSSION*

### A. *Pattern or Practice of Discrimination*

■ The Fair Housing Act prohibits various forms of discrimination in the rental housing market. Specifically, the Act makes it unlawful:

> (a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because or race, color, religion, sex, familial status, or national origin.
>
> * * *
>
> (d) To represent to any person because of race, color, religion, sex, handicap, familial status, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available.

42 U.S.C. § 3604(a)-(d). The Act also empowers the Government to enforce these bans. It does not confer unlimited authority however. Rather, the Government may bring a civil action against "any person or group of persons . . . engaged in a pattern or practice of resistance to the full enjoyment of any of the rights granted by this [Act] . . ." 42 U.S.C. § 3614(a). The existence of a pattern or practice of discrimination is a predicate to the Government's ability to maintain a Fair Housing Act suit.

*See United States v. Bob Lawrence Realty, Inc.,* 474 F.2d 115, 122–23 (5th Cir.1973), *cert. denied,* 414 U.S. 826, 94 S.Ct. 131, 38 L.Ed.2d 59 (1973) (noting that the Government has standing to sue when a pattern or practice exists).[7]

■ To establish a pattern or practice, the Government must do more than submit proof of discrimination. It must show "by a preponderance of the evidence that . . . discrimination was the company's standard operating procedure[,] the regular rather than the unusual practice." *Int'l Brotherhood of Teamsters v. United States,* 431 U.S. 324, 336, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). Isolated, accidental, or sporadic instances of discrimination are insufficient. *Id.*[8]

■ While Defendants' misconduct must be more than isolated to rise to the level of an actionable pattern or practice, there is no threshold number of incidents that must occur before the Government may initiate litigation. *See Bob Lawrence Realty,* 474 F.2d at 123–24. Indeed, " 'the number of [violations] . . . is not determinative . . . no mathematical formula is workable, nor was any intended. Each case must turn on its own facts.' " *Id.* at 124 (*quoting United States v. West Peachtree Tenth Corp.,* 437 F.2d 221, 227 (5th Cir. 1971)). Whether the evidence presented demonstrates a pattern or practice is ordinarily a question of fact for the jury. *See*

---

7. The Fair Housing Act also enables the Government to bring suit if a violation "raises an issue of general public importance." 42 U.S.C. § 3614(a). Thus, even if a pattern or practice of discrimination does not exist, the Government may proceed if Defendants' conduct jeopardizes important public interests. Although the Government invoked this prong as a basis for this suit, (Second Am. Compl. at ¶ 29.b.), the motion papers focus almost ex-

clusively on the pattern and practice requirement. This Court will do the same.

8. While *Teamsters* was a Title VII case, its construction of the terms pattern and practice has been embraced in other civil rights contexts. *See, e.g., United States v. Lansdowne Swim Club,* 894 F.2d 83, 88 (3d Cir.1990) (Title II); *United States v. DiMucci,* 879 F.2d 1488, 1497 n. 11 (7th Cir.1989) (Fair Housing Act).

*United States v. Balistrieri,* 981 F.2d 916, 930 (7th Cir.1992).

### 1. *Pattern or Practice of Racial Discrimination*

 A jury viewing the record could reasonably conclude that Defendants routinely discriminated. In *Balistrieri,* the Seventh Circuit affirmed a jury's determination that the defendants engaged in a pattern of discrimination. The evidence in that case is strikingly similar to the evidence now before the Court. There, a local housing organization tested the defendants' apartment building five times in just over one month. During the tests, black and white testers asked to see one or two bedroom apartments. They received different responses based on their race. Their testimony showed that the building's rental agent (1) quoted black testers higher rents than their white counterparts; (2) neglected to show black testers available apartments but took white testers on complete tours; and (3) provided rental applications to white testers while refusing to give them to black testers. *Balistrieri,* 981 F.2d at 924–25, 929. In addition, two non-tester witnesses came forward and testified. The first, a black individual, recounted the trouble she had trying to rent from defendants. The second, a white individual, testified about how defendants facilitated her application. *Id.* at 925–26. The Seventh Circuit agreed that these incidents established a pattern. The Court was particularly impressed with the chronology of events, stating that "a jury may reasonably infer that when a defendant who in six chances over the course of little more than a month consistently discriminates, the discrimination is more than a sporadic occurrence." *Id.* at 930.

Like *Balistrieri,* the investigation in this case occurred over a relatively brief period. In the span of one month, the Government tested the Subject Properties three times. Defendant Rosenstein treated black testers differently than white testers on each occasion. She told black testers that two bedroom units were unavailable, when it appears that at least one such unit was vacant. Within hours after each black tester departed, she informed a white tester that a two bedroom was available or would likely become so. In addition, Defendant Rosenstein encouraged white testers and showed them vacant apartments. In one instance, she even followed up to verify a white tester's interest. In marked contrast, she generally discouraged black testers, suggested that two bedroom units were impossible to locate, and instructed them to put their names on a fictitious waiting list if they desired to pursue a unit.[9] Defendant Rosenstein also refused to supply rental applications to interested black testers, but gave applications to white testers.

The Government's evidence creates a genuine issue of fact for the jury. *See Balistrieri,* 981 F.2d at 930. While, in the abstract, three fair housing tests might not necessarily reflect Defendants' rental practices, the tests at issue are particularly probative. They all occurred within one month and yielded virtually identical results. The timing and uniform results of these tests give rise to a permissible inference that racial discrimination is not a sporadic event but, instead, is part of the way that Defendants do business. *Id.* The statements of Ms. Dacres and Mr. Jackson, viewed in the light most favorable to the Government, buttress this conclusion. Ms. Dacres, an African American, avers that Defendants denied her rental applica-

**9.** Defendants admit that they "do not maintain formalized waiting lists of prospective tenants for vacant and/or available apart-

ments." (Defendants' Statement of Material Facts at ¶ 13.)

tion and Mr. Jackson, who is also African American, relates that he secured an apartment only after the Government filed this suit. Their experiences, which occurred after the Government's testing ended, arguably show that Defendants' discriminatory practices are pervasive, not an aberration limited to a discrete period of time. Because these inferences and conclusions are permissible, there exists a genuine issue as to whether Defendants consistently discriminated. Therefore, summary judgment must be denied.

Defendants attempt to resist this outcome on several grounds. First, they argue that the Government has presented only three instances of misconduct. (Defendants' Br. in Support of Motion for Summary Judgment at p. 15.) In their view, this is the "bare minimum" number of acts needed to establish a pattern or practice. (*Id.* at. p. 16.) Defendants are incorrect on both points. In addition to its three fair housing tests, the Government identified two additional witnesses--Ms. Dacres and Mr. Jackson--who will testify about Defendants' rental practices. Thus, the record contains evidence of at least five incidents of racial discrimination. More importantly, Defendants' focus on the number of incidents is misplaced. The Fair Housing Act does not obligate the Government to prove a minimum number of violations to establish a pattern or practice of discrimination. *See Bob Lawrence Realty*, 474 F.2d at 124; *cf. DiMucci*, 879 F.2d at 1499 (recognizing a pattern of discrimination where "defendants refused *on occasion* to rent to black bona fide apartment seekers, gave black

and white testers differing information on the availability of apartments, and treated black testers significantly differently from white testers") (emphasis supplied); *United States v. Big D Enterpr., Inc.*, 184 F.3d 924, 931 (8th Cir.1999), *cert. denied*, 529 U.S. 1018, 120 S.Ct. 1419, 146 L.Ed.2d 311 (2000) (finding that discrimination against three individuals was sufficient).

Second, Defendants argue that a pattern or practice does not exist because tests at a fourth property revealed no discrimination. Defendant Garden Homes either owns or manages a Connecticut apartment complex known as Aspen Woods. Almost a year after it filed this suit, the Government began investigating Aspen Woods for national origin discrimination. Defendants contend that the Aspen Woods investigation resulted in a no-discrimination finding, which shows that discrimination does not pervade their business practices.[10] Assuming that the purported results of the Aspen Woods investigation are relevant and admissible, that evidence does not compel summary judgment for Defendants. Whether a pattern or practice exists is a question of fact for the jury. *See Balistrieri*, 981 F.2d at 930. At best, the Aspen Woods evidence contradicts the rest of the Government's proofs and creates a factual dispute. The jury, not this Court, must resolve that dispute by evaluating the Aspen Woods evidence, determining whether it is credible, weighing it against all the evidence presented, and ultimately deciding if it defeats the Government's case. *Id.*[11]

---

10. In his recent Letter Opinion, Magistrate Judge Chesler barred Defendants from using at trial evidence related to the Aspen Woods investigation. He deemed that evidence insufficiently probative as well as highly misleading and burdensome. Defendants appealed that decision to this Court. Their appeal is pending.

11. The Court has not determined that the Aspen Woods evidence is admissible. That question remains open on appeal. Instead, the Court has merely assumed for analytical purposes that the evidence is proper.

Third, Defendants proffer statistics to counter the existence of a pattern or practice. These statistics purportedly show that the percentage of African Americans living in the Subject Properties exceeds the percentage of African Americans living in Morris County, New Jersey or Parsippany, where the Subject Properties are located. These figures are not determinative for several reasons. The most glaring is that they are faulty. At least two of the individuals that Defendants counted as African American--for purposes of calculating the percentage of African American tenants--are in fact white. (Halperin Decl. at Ex. Q, ¶¶ 6-8.) This error skews Defendants' calculations.

■ Moreover, while statistical proof is relevant in housing discrimination actions, it does not carry dispositive weight. *See United States v. Housing Authority of the City of Chickasaw*, 504 F.Supp. 716, 729 (S.D.Ala.1980). Defendants' figures must be weighed along with all the other evidence presented to determine if a pattern or practice exists. The jury is responsible for conducting that weighing process. *See Balistrieri*, 981 F.2d at 930.

Finally, the mere presence of black tenants at the Subject Properties does not preclude the Government from establishing a pattern or practice of racial discrimination. In an analogous context, the Third Circuit announced that "we need not find that [the defendant] always discriminated to find that it engaged in such a pattern or practice." *Lansdowne Swim Club*, 894 F.2d at 89. This statement recognizes that a defendant might on occasion make exceptions to its discriminatory norm, but that such exceptions do not bar liability. The Third Circuit's holding precludes summary judgment in this case. It is possible that Defendants took in a small number of African American tenants to disguise their discriminatory practices. *Cf. Davis v. Man-*

*sards*, 597 F.Supp. 334, 345 (N.D.Ind.1984) (finding a pattern even though defendants rented to blacks "in significant numbers," because defendants sought "to control the complex's black population by discouraging all negro applicants, allowing a few of the most promising apartment seekers to apply, and finally choosing to rent to those black applicants who pass some secret test unrelated to apartment availability"). Or Defendants may have adopted discriminatory practices to prevent the minority population from growing. Or, as Defendants now argue, the Subject Properties may house black tenants because Defendants do not routinely discriminate. Each of these explanations is plausible. It is the jury's task to decide which one, if any, fits the facts of this case. *See Balistrieri*, 981 F.2d at 930.

For all of these reasons, there exists a genuine issue of fact as to whether Defendants engaged in a pattern and practice of violating 42 U.S.C. § 3604. Thus, summary judgment must be denied.

### 2. *Pattern or Practice of Familial Status Discrimination*

■ A jury could also reasonably find that Defendants committed a pattern or practice of familial status discrimination. Proof that a party adopted a discriminatory policy satisfies the Fair Housing Act's pattern and practice requirement. *Cf. United States v. Bd. of Ed. for the School District of Philadelphia*, 911 F.2d 882, 892 (3d Cir.1990) (holding in a Title VII case that an openly declared policy of discrimination was sufficient); *Chickasaw*, 504 F.Supp. at 727 (recognizing that "when, as here, a policy of regular application is itself alleged to be discriminatory, the pattern or practice requirement is satisfied"). Once a discriminatory policy has been established or admitted, the plaintiff does not have to introduce specific instances of

discrimination to prove a pattern or practice. *See United States v. L & H Land Corp.*, 407 F.Supp. 576, 580 (S.D.Fla.1976).

The record contains ample proof from which a jury could find that Defendants adhered to a discriminatory rental policy. During her deposition, Defendant Rosenstein candidly admitted that Defendants preferred to rent ground floor apartments to families with small children. (Halperin Decl. at Ex. J, p. 121, ln. 21-25.) Although she denied the existence of a formal company policy, she testified that it was her policy to tell applicants with toddlers or infants that "we would prefer having them on the first floor ..." (*Id.*) She further testified that her supervisor knew of her policy and that he did not instruct her to cease following it. (*Id.* at p. 123, ln. 2-4.)

These admissions create a substantial likelihood that Defendants violated 42 U.S.C. § 3604(c) by adopting an unlawful policy, which preferred keeping families with children off the second floor of the Subject Properties.[12] It will be the jury's task to determine if Defendants' policy actually existed. *See United States v. Branella*, 972 F.Supp. 294, 302 (D.N.J.1997). Because the Government has offered sufficient proof of a discriminatory policy, which satisfies the Fair Housing Act's pattern or practice requirement, summary judgment must be denied.[13]

Defendants disagree with this conclusion because, in their view, Defendant Rosenstein was not a policy-maker for the Subject Properties. Their position is that any policies created and implemented by Defendant Rosenstein have no legal significance because she lacked authority to make them. This argument is legally untenable. A landlord's duty not to discriminate against prospective tenants is non-delegable. *See Alexander v. Riga*, 208 F.3d 419, 432–33 (3d Cir.2000). As a result, Defendants may be held vicariously liable for the misconduct of their rental agent absent proof that they attempted to prevent discrimination at the Subject Properties. *Id.* 433–34 (remanding for jury to evaluate defendant's anti-discrimination efforts). Here, the record lacks proof that Defendants took any steps to terminate Defendant Rosenstein's discriminatory policy. In fact, the opposite is true. The Government presents undisputed evidence that Defendant Rosenstein's supervisor knew of her preference and allowed her to continue expressing it. This evidence suggests that Defendants may be directly liable for Defendant Rosenstein's illegal policy because they ratified or authorized her conduct. *Id.* at 432; *see also Balistrieri*, 981 F.2d at 930 (permitting jury to decide whether owner was liable for rental

---

**12.** 42 U.S.C. § 3604(c) renders it illegal:

To make, print, or publish ... any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination.

*See also* 24 C.F.R. § 100.75(b) (proscribing written and oral preferences).

**13.** Defendants do not argue that the Fair Housing Act does not prohibit their policy of directing families with children to apartments on the first floor. Accordingly, the Court does

not reach this issue. However, the Court does note that the Department of Housing and Urban Development's regulations deem it unlawful to assign "any person to a particular section of a community, neighborhood or development, or to a particular floor of a building, because of race, color, religion, sex, handicap, familial status, or national origin." 24 C.F.R. § 100.70(c)(4). At least one federal court has relied on this regulation in holding that the creation and enforcement of a policy against renting second floor units to families with children violated the Fair Housing Act. *See Fair Housing Congress v. Weber*, 993 F.Supp. 1286, 1293 (C.D.Cal.1997).

agent's discrimination because the record contained evidence that suggested that owner knew of and approved that conduct).

Even if Defendants did not adopt a discriminatory policy against families with children, the record contains adequate proof of specific instances of discrimination to establish a pattern or practice. During the April 8, 1998 test, Defendant Rosenstein stated outright that Defendants would not consider an applicant with children for a second floor vacancy. (Halperin Decl. at Ex. A, p. 3, ln. 8-10.) She further stated that, because the tester did not have children, she was eligible for either a first or second floor unit. (*Id.* at ln. 10-11.)

Subsequent incidents suggest that these statements were not random, isolated, or unrepresentative of Defendant Rosenstein's practices. On May 6, 1998, she queried a tester about her family composition and stated that it was "important" that the tester did not have any children. (*Id.* at Ex. p. 2, ln. 17.) In April 1999, Defendant Rosenstein told Ms. Dacres that it would be illegal to rent a second floor apartment to a family with children. (*Id.* at Ex. I, ¶ 10.) Defendants subsequently rejected Ms. Dacres' rental application. In light of Defendant Rosenstein's statements, a jury could rationally conclude that they did so because Ms. Dacres had a young child. Finally, Mr. Lynch and Ms. Footman assert that, at the time they sought apartments, Defendant Rosenstein communicated the policy against renting second floor units to families with children.

These five incidents, coupled with Defendant Rosenstein's admissions, provide an adequate basis for a finding that Defendants embraced a pattern or practice of relegating families with small children to first floor apartments, in derogation of 42 U.S.C. § 3604. *See Big D Enterpr.* 184

F.3d at 931 (affirming finding of a pattern of race discrimination where the government presented three specific incidents along with testimony from defendant's employees). Therefore, summary judgment must be denied.[14]

 Defendants challenge this conclusion for several reasons. Their primary argument is that the Subject Properties contain a high percentage of tenants with children, and that a large number of these families live in second floor residences. As previously noted, statistical evidence is not dispositive. *See Chickasaw,* 504 F.Supp. at 729. It must be weighed along with all the other proofs to determine whether a pattern exists. *See Balistrieri,* 981 F.2d at 930. Moreover, the mere fact that in the past Defendants rented second floor units to families with children does not preclude the jury from finding that Defendants now adhere to a contrary pattern or practice. *See Lansdowne Swim Club,* 894 F.2d at 89; *Davis,* 597 F.Supp. at 345.

Defendants also question some of the Government's evidence. Specifically, they maintain that Ms. Dacres' rental application was denied for credit reasons, not because she is African American or has a small child. However, they submit no evidence to support this claim. Even if they had, their contention merely creates a factual dispute that must be resolved at trial. *See Balistrieri,* 981 F.2d at 930. Given the evidence supporting the Government's case, a jury would be entitled to reject Defendants' credit denial explanation. *See United States v. Reddoch,* 467 F.2d 897, 899 (5th Cir.1972) (affirming conclusion that credit check was employed as a ruse to cover up racially motivated denials). Moreover, a jury could accept Defendants' credit denial justification and still find that

---

**14.** The record does not contain sufficient evidence to support a finding that Defendants engaged in a pattern or practice of refusing to rent any units to families with children.

Defendants discriminated against Ms. Dacres because discrimination does not have to be the sole reason for Defendants' conduct. *See Selden v. United States Dep't of Housing & Urban Development,* 785 F.2d 152, 161 (6th Cir.1986). As long as the Government shows that "familial status was *a* motivating factor (though not necessarily the sole motivating factor) in the allegedly violative [denial]," *Branella,* 972 F.Supp. at 298 (emphasis original), then Ms. Dacres' experience would support the existence of a pattern or practice. Therefore, Defendants' credit denial argument does not require dismissal.

For all of these reasons, the Government has presented adequate evidence to establish the existence of a pattern or practice of familial status discrimination. Consequently, summary judgment is inappropriate.

### B. *Defendant Wilf's Liability for the acts of his Rental Agent*

■ Finally, Defendant Wilf contends that he deserves summary judgment because he cannot be held responsible for the conduct of his rental agent. He represents that he has nothing to do with day-to-day management of the Subject Properties and that he took adequate steps to prevent discrimination from occurring. Defendant Wilf further argues that, even if he is responsible, he cannot be held liable for punitive damages because his conduct was not egregious. Defendant Wilf is mistaken.

The Third Circuit recently rejected both of his arguments in *Alexander v. Riga,* 208 F.3d 419 (3d Cir.2000). In *Alexander,* Mr. and Mrs. Riga owned an apartment building, which Mrs. Riga managed. The plaintiffs presented substantial evidence that Mrs. Riga discriminated against African American applicants, resulting in a determination that she violated the Fair Housing Act. Mr. Riga argued that he could not be held liable for punitive damages based on his wife's conduct because he was not personally involved in the building's management, did not acquiesce in Mrs. Riga's discriminatory practices, and was out of the country at the time Mrs. Riga discriminated against plaintiffs. The Third Circuit disagreed, holding that "Mr. Riga could not insulate himself from liability for discrimination in regard to an apartment building owned jointly by him and his wife and managed for their joint benefit, merely by relinquishing the responsibility for preventing discrimination to Mrs. Riga, his managerial agent." *Id.* at 433.

The court announced a general rule that property owners have a *non-delegable* duty not to discriminate and, as a result, will be held vicariously liable for the discriminatory actions of their rental agents. *Id.*[15] An owner may avoid vicarious liability by making "active anti-discrimination efforts." *Id.* at 434. While the court did not define those efforts precisely, it did suggest that an owner must make a good faith attempt to deter and detect illicit housing practices. *Id.* at 433–34.

*Alexander* precludes summary judgment in this case. Defendant Wilf is an owner of at least one of the Subject Properties and has a hand in managing the others. As such, he has a nondelegable duty to avoid operating those complexes in a discriminatory manner and can be held accountable if his rental agents breach that duty. Thus, if Defendant Rosenstein violated the Fair Housing Act, then Defendant Wilf will be liable for both compensatory and punitive

---

**15.** The court's holding brought the Third Circuit in line with a number of other circuits that have considered the issue. *See Alexander,* 208 F.3d at 433 (citing cases); *see also Weber,* 993 F.Supp. at 1294 (reciting that "the duty not to discriminate under the Fair Housing Act is nondelegable").

damages even if he did not have a role in the day-to-day affairs of the Subject Properties, unless he took active antidiscrimination actions. *Id.*

Defendant Wilf contends that he made concerted efforts to avoid and eliminate discrimination at the Subject Properties. In support of this contention, he points to a single phone call to Jacob Beri, a Garden Homes employee, during which Mr. Beri allegedly assured him that adequate safeguards were in place to prevent discrimination. This evidence does not compel summary judgment for several reasons. First, this alleged phone call occurred after the Government filed suit and, thus, says nothing about Defendant Wilf's prelitigation efforts. Second, Mr. Beri denies that this conversation ever occurred. (Halperin Decl. at Ex. V, p. 193 ln. 25 to p. 194, ln. 20.) Third, and most importantly, the record contains evidence that Defendant Wilf never required any of his employees, including Defendant Rosenstein, to receive fair housing training. (*Id.* at Ex. W, p. 129, ln. 1 to p. 130, ln. 17.) At best, there are genuine issues of fact as to the sufficiency of Defendant Wilf's efforts to prevent his agents from discriminating. *See id.* at 434 (leaving it up to "the jury on remand to determine whether Mr. Riga engaged in active anti-discrimination efforts sufficient to protect him from the impact of the general rule that he may not delegate to Mrs. Riga the duty not to discriminate").

As to punitive damages, the Government does not have to establish that Defendant Wilf behaved egregiously to obtain a punitive damage award. *Alexander,* 208 F.3d at 433–34.

For all of these reasons, Defendant Wilf's motion for summary judgment is denied.

## IV. *CONCLUSION & ORDER*

The record contains evidence from which a jury could find (1) that Defendants engaged in a pattern or practice of discrimination on the basis of race and family status, and (2) that Defendant Wilf is liable for the discriminatory conduct of his rental agent. Therefore:

It is on this ___ day of July 2001:

ORDERED that Defendants' motion for summary judgment, on the ground that the Government has not offered sufficient proof of a pattern or practice of discrimination, is DENIED; and it is further

ORDERED that Defendant Wilf's motion for summary judgment, on the ground that he is not liable for the acts of his rental agent, is also DENIED.